# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2014AP195 |
| COMPLETE TITLE: | Braylon Seifert, by his Guardian ad litem, Paul J. Scoptur, Kimberly Seifert and David Seifert, Plaintiffs-Respondents, Dean Health Insurance and BadgerCare Plus, Involuntary-Plaintiffs, v. Kay M. Balink, M.D. and Proassurance Wisconsin Insurance Company, Defendants-Appellants-Petitioners. |

REVIEW OF A DECISION OF THE COURT OF APPEALS

| | |
|---|---|
| OPINION FILED: | January 6, 2017 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | September 6, 2016 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| COURT: | Circuit Court |
| COUNTY: | Grant |
| JUDGE: | Craig R. Day |

| | |
|---|---|
| JUSTICES: | |
| CONCURRED: | ZIEGLER, J. and GABLEMAN, J. concurs, joined by ROGGENSACK, C. J., J. (Opinion filed). |
| DISSENTED: | KELLY, J. joined by BRADLEY, R. G., J. dissent (Opinion Filed). |
| NOT PARTICIPATING: | |

ATTORNEYS:

For the defendants-appellants-petitioners, there were briefs by *Samuel J. Leib*, *Brent A. Simerson,* and *Leib, Knott, Gaynor, LLC*, Milwaukee, WI, and oral argument by *Samuel J. Leib*.

For the plaintiffs-respondents, there was a brief by *Kenneth M. Levine*, (pro hac vice), and *Kenneth M. Levine & Associates, LLC*, Brookline, MA, and *Paul J. Scoptur* and *Aiken & Scoptur, S.C.*, Milwaukee. Oral argument by Kenneth M. Levine.

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2014AP195
(L.C. No. 2011CV588)

STATE OF WISCONSIN      :      IN SUPREME COURT

**Braylon Seifert, by his Guardian ad litem, Paul J. Scoptur, Kimberly Seifert and David Seifert,**

    **Plaintiffs-Respondents,**

**Dean Health Insurance and BadgerCare Plus,**

    **Involuntary-Plaintiffs,**

    **v.**

**Kay M. Balink, M.D. and Proassurance Wisconsin Insurance Company,**

    **Defendants-Appellants-Petitioners.**

**FILED**

**JAN 6, 2017**

Diane M. Fremgen
Clerk of Supreme Court

---

REVIEW of a decision of the Court of Appeals. *Affirmed.*

¶1 SHIRLEY S. ABRAHAMSON, J. This is a review of a published decision of the court of appeals.[1] The court of appeals affirmed a judgment and an order of the Circuit Court for Grant County, Craig R. Day, Judge, in favor of the plaintiff, Braylon Seifert (by his guardian ad litem, Paul

---

[1] Seifert ex rel. Scoptur v. Balink, 2015 WI App 59, 364 Wis. 2d 692, 869 N.W.2d 493.

Scoptur, and his parents, Kimberly Seifert and David Seifert) and against the defendants, Dr. Kim Balink (the defendant doctor) and Proassurance Wisconsin Insurance Company.

¶2 This medical malpractice case is based on the claim that the defendant doctor was negligent in the prenatal care of Braylon Seifert's mother and in Braylon's delivery in May 2009.

¶3 Complications arose during Braylon's delivery. Almost immediately after Braylon's head appeared, the head retracted, indicating a shoulder dystocia, that is, indicating that the shoulder was stuck, prohibiting the body from being delivered. The defendant doctor undertook a series of steps to resolve the dystocia and delivered the baby. Braylon's shoulder was injured, however, and the growth and function of Braylon's left arm are permanently and severely limited.

¶4 Braylon claims that the defendant doctor's care during delivery fell below the standard of reasonable care and caused him to have a permanent brachial plexus injury, that is, to have a permanent injury to the nerves that animate his left arm.

¶5 Braylon's obstetrical expert witness, Dr. Jeffrey Wener, testified that he was familiar with the standard of care for family practitioners practicing obstetrics with regard to prenatal care, labor, and delivery. Dr. Wener explained the reasonable care to be used in a case like the instant one and opined that the care provided and the procedures used by the defendant doctor fell below the standard of reasonable care.

¶6 The defendants challenged Dr. Wener's testimony in the circuit court, in the court of appeals, and in this court as

2

inadmissible under the recently amended Wis. Stat. § 907.02(1) (2013-14).[2] This amended statute governing the admissibility of expert evidence was enacted in 2011. It adopted the federal evidentiary standard codified in Federal Rule of Evidence 702 (2000), which in turn adopted the reliability standard explicated in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993).

¶7 The new Daubert aspect of Wis. Stat. § 907.02(1) became effective February 1, 2011, and applies in the instant case.[3] It requires that expert testimony be based on sufficient facts or data and that the expert testimony be the product of reliable principles and methods.[4] The expert witness must apply

---

[2] All references to the Wisconsin Statutes are to the 2013-14 version unless otherwise indicated.

[3] Wisconsin Stat. § 907.02(1) provides as follows, with emphasis added to show the new language added in 2011:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if the testimony is based upon sufficient facts or data, the testimony is the product of reliable principles and methods, and the witness has applied the principles and methods reliably to the facts of the case.

[4] The case law uses the words "methodology" and "methods" interchangeably. See, e.g., Fuesting v. Zimmer, Inc., 421 F.3d 528, 535 (7th Cir. 2005), opinion vacated on other grounds on reh'g, 448 F.3d 936 (7th Cir. 2006) ("The district court must also, in keeping with its gatekeeper's duty, assess the reliability of the methodology the expert has employed in arriving at his opinion.").

the principles and methods reliably to the facts of the case.[5] These three aspects of the Daubert standard are often referred to as the "reliability standard."

¶8    Both the circuit court and the court of appeals concluded in the instant case that Dr. Wener's testimony was admissible under § 907.02(1).

¶9    The jury's special verdict found that the defendant doctor was negligent in the delivery of Braylon and in the prenatal care of his mother and that this negligence was a cause of injury to Braylon.    The jury further found that Braylon should be awarded $100,000 for past pain, suffering, disability, and disfigurement and $1,650,000 for future pain, suffering, disability, and disfigurement.

¶10    The jury did not award any damages to Braylon's parents.    The jury did not find that the defendant doctor violated informed consent.    These two rulings are not at issue in this review.

¶11    The circuit court entered judgment for Braylon for $135,000 in medical expenses and $750,000 in pain and suffering, "as reduced pursuant to Wisconsin Statute, plus interest thereon provided by law."[6]

---

[5] See Daniel D. Blinka, The Daubert Standard in Wisconsin: A Primer, Wis. Lawyer, Mar. 2011, at 61 ("Only when the witness identifies her principles and methods is the trial court in a position to assess their reliability").

[6] See Wis. Stat. § 893.55, which caps noneconomic damages at $750,000 in medical malpractice cases.

4

¶12 On three occasions, the circuit court carefully and extensively considered the defendants' challenges to the admissibility of Dr. Wener's testimony under Wis. Stat. § 907.02(1): at a "Daubert" hearing before trial, on a challenge to Dr. Wener's testimony at trial, and on motions after verdict. The circuit court ruled in favor of admitting Dr. Wener's testimony at each of these junctures.

¶13 Seeking a new trial, the defendants raise three issues in this court:

I.  Did the circuit court err in admitting the testimony of Dr. Jeffrey Wener, Braylon's medical expert? The defendants claim that because Dr. Wener's testimony was experience-based, his method was unreliable and inadmissible under Wis. Stat. § 907.02(1).

II. Did several remarks of Braylon's counsel during closing argument violate the circuit court's orders in limine, prejudice the jury, and warrant a new trial?

III. Should this court grant a new trial in the interests of justice pursuant to Wis. Stat. § 751.06?

¶14 The court of appeals affirmed the judgment of the circuit court, concluding that a new trial was not warranted.

¶15 For the reasons set forth, we affirm the decision of the court of appeals affirming the circuit court's judgment and order that a new trial was not warranted. We conclude:

I.  The circuit court did not err in applying Wis. Stat. § 907.02(1) and admitting as reliable Dr. Wener's

5

expert medical testimony on the standard of reasonable care based on his personal experiences.

II. The circuit court did not err in concluding that Braylon's counsel's remarks during closing argument did not constitute prejudicial error justifying a new trial.

III. A new trial should not be granted pursuant to Wis. Stat. § 751.06 in the interests of justice.

¶16 We shall address each issue in turn. The facts and law relevant to each issue are stated in the discussion of that issue.

I

¶17 The first issue entails the defendants' challenge to the testimony of Braylon's medical expert, Dr. Jeffrey Wener, as unreliable and inadmissible under Wis. Stat. § 907.02(1). Dr. Wener testified about the standard of reasonable care in the instant case and how the defendant doctor breached the standard.

¶18 We review the circuit court's admission of Dr. Wener's testimony for compliance with the Daubert reliability standard codified in Wis. Stat. § 907.02(1). The defendants' challenge was that Dr. Wener's experience-based testimony is not the product of a reliable method. We conclude that Dr. Wener's testimony was reliable and admissible under § 907.02(1). Our reasoning in reaching the conclusion that the circuit court did not erroneously exercise its discretion in admitting Dr. Wener's testimony proceeds as follows:

6

A.   We set forth the facts of the defendant doctor's prenatal care of Braylon's mother and conduct during Braylon's delivery.  See ¶¶19-28, infra.

B.   We examine undisputed facets of the case, including aspects of Dr. Wener's testimony and the standard of reasonable care applicable to the defendant doctor in the instant case.  See ¶¶29-37, infra.

C.   We summarize Dr. Wener's testimony about the standard of reasonable care of a family practice doctor practicing obstetrics.  Dr. Wener's testimony was based on his personal experiences; his opinion was that the defendant doctor breached that standard.  See ¶¶38-49, infra.

D.   We discuss the reliability standard set forth in Wis. Stat. § 907.02(1) that governs admission of expert evidence.  We pay special attention to assessing the method used by a medical expert based on the expert's personal experiences.  See ¶¶50-93, infra.

E.   We set forth the standard for reviewing a circuit court's determination that medical expert testimony is admissible under the reliability standard incorporated in Wis. Stat. § 907.02(1).  See ¶¶94-100, infra.

F.   Against this backdrop of the teachings about the reliability of the methodology of medical expert opinion testimony based on personal experiences and the standards for reviewing a circuit court's determination of reliability and admissibility, we

7

review the circuit court's ruling and conclude, as did the court of appeals, that the circuit court did not erroneously exercise its discretion in admitting Dr. Wener's expert medical testimony on the standard of reasonable care based on his personal experiences. Accordingly, we affirm the decision of the court of appeals affirming the circuit court's admission of Dr. Wener's testimony. See ¶¶101-146, infra.

A

¶19 The defendant doctor, a family practitioner, provided prenatal care to Braylon's mother during regular prenatal visits and also delivered Braylon.

¶20 During the regular prenatal visits, as relevant here, the defendant doctor measured the mother's weight, tested the mother for gestational diabetes, and performed fundal height measurements. Obstetricians use the results of these tests to estimate the baby's birth size. An obese or diabetic mother and a large fundal height indicate macrosomia (a large baby). The baby's expected weight influences decisions made leading up to and during the delivery.

¶21 Braylon's mother weighed 269 pounds at the start of her pregnancy, and she gained approximately 36 pounds during the pregnancy.

¶22 The defendant doctor used a one-hour glucose screening test to determine whether the mother had gestational diabetes. The test result was 131 mg/dL. A three-hour glucose screening test diagnoses gestational diabetes more accurately.

¶23 The defendant doctor also performed fundal height measurements, which, according to Dr. Wener, involves "literally putting a tape measure on mom's pubic bone and then extending the tape to the top of the fundus, which is the top of the mom's uterus."

¶24 Obstetricians may also perform an ultrasound near the date of delivery to get a more accurate estimate of the baby's size. The defendant doctor did not perform an ultrasound.

¶25 The defendant doctor estimated that Braylon would weigh eight pounds, eight ounces at birth. Braylon's actual birth weight was nine pounds, twelve ounces.

¶26 Braylon's mother arrived at the hospital on May 28, 2009 for inducement of labor. Initially, things went well. The mother was completely dilated and ready to push by 11:00 p.m. After an hour, the baby had started descending but Braylon's mother had grown tired.

¶27 The defendant doctor then decided to use a vacuum device to assist in the delivery. This device is essentially a suction cup that attaches to the baby's head and is used to aid the mother's efforts. Thirteen minutes and four contractions later, the baby's head delivered.

¶28 Right after the baby's head emerged, it retracted into the mother (the "turtle sign") and the defendant doctor was faced with a shoulder dystocia. A shoulder dystocia occurs when one or both of the baby's shoulders become stuck inside the mother's body and prevent delivery. The defendant doctor then performed a series of well-known obstetrical maneuvers (physical

9

manipulations to mother and baby) to resolve the dystocia. The baby was delivered approximately three minutes after the diagnosis of shoulder dystocia.

B

¶29 Before we delve into the substance of Dr. Wener's challenged testimony, we turn to undisputed facets of the case, including aspects of Dr. Wener's testimony and the standard of reasonable care for a family practice doctor practicing obstetrics.

¶30 The parties do not dispute that the applicable standard of care under Wisconsin law is reasonable care for a family practice doctor practicing obstetrics and that a family practice doctor may be liable for injury caused by breach of that standard of care.

¶31 Nor do the parties dispute that the jury in the instant case was properly instructed on this standard of reasonable care. The circuit court presented the standard of reasonable care, as set forth in Wisconsin Jury Instruction Civil 1023, to the jury as follows:

> In treating and diagnosing Kimberly Seifert's pregnancy, labor, and delivery, Dr. Kay Balink was required to use the degree of care, skill, and judgment which reasonable <u>family practice doctors practicing obstetrics</u> would exercise in the same or similar circumstances, having due regard for the state of medical science at the time of the pregnancy, labor, and delivery. A doctor who fails to conform to this standard is negligent.
>
> The burden is on the plaintiffs to prove that Dr. Kay Balink was negligent. A doctor is not negligent; [sic] however, for failing to use the highest degree

of care, skill, and judgment, or solely because a bad result may have followed her care, and treatment and/or diagnosis.

The standard you must apply in determining if Dr. Kay Balink is negligent is whether Dr. Kay Balink failed to use the degree of care, skill, and judgment which reasonable <u>family practice doctors practicing obstetrics</u> would exercise given the state of medical knowledge at the time of the treatment and diagnosis in issue. (Emphasis added.)

¶32 The parties do not dispute that Braylon was required to introduce expert testimony to describe the care that satisfies the standard of reasonable care in the instant case and to detail the defendant doctor's failure to furnish care that met this standard.

¶33 Braylon offered Dr. Wener's testimony to establish the standard of reasonable care for a family practice doctor practicing obstetrics. The parties do not dispute that Dr. Wener is a qualified expert; that Dr. Wener has "scientific, technical, or other specialized knowledge" that could assist the trier of fact; and that if admissible, his testimony would be relevant and helpful to the trier of fact. Wis. Stat. § 907.02(1).

¶34 The parties also do not dispute:

- Braylon suffered a shoulder dystocia.
- Immediately after the delivery, Braylon's left upper arm was not functioning, and within a few days after birth he was diagnosed with a permanent brachial plexus injury.

11

- Braylon's brachial plexus injury limits the growth and function of the arm, required surgery, and will require continued therapy to ameliorate the injury.
- An obese mother, gestational diabetes, and a macrosomic baby increase the risk of shoulder dystocia.

¶35 The circuit court stated that the parties do not seriously question that the application of excessive traction beyond what the fetus can withstand may be a cause of severe brachial plexus injuries during childbirth, although the circuit court acknowledged that there were contentions that other causes may have been present in the instant case. Relatedly, the parties do not dispute that the use of a vacuum during delivery may increase the risk of a brachial plexus injury.

¶36 Collectively, these shoulder dystocia risk factors——obese mother, gestational diabetes, macrosomic baby, excessive traction, and vacuum-assisted delivery——are undisputed; these are the principles that guide Dr. Wener's testimony.

¶37 The defendants' challenge to Dr. Wener's testimony is that his testimony is not the product of reliable methods, that is, the defendants contend that Dr. Wener's methodology is unreliable. Specifically, the defendants argue that Dr. Wener's testimony is not the product of reliable methods under Wis. Stat. § 907.02(1) because the testimony was based on Dr. Wener's personal experiences. In evaluating the defendants' challenge, we begin by reviewing the substance of Dr. Wener's testimony.

C

¶38 Dr. Wener testified at length about the standard of reasonable care in the instant case and opined that the defendant doctor breached that standard of reasonable care. Dr. Wener's lengthy expert medical testimony was based on his personal experiences, and he was subjected to extensive cross-examination.

¶39 Dr. Wener described his extensive qualifications. He stated that he is a board certified obstetrician-gynecologist (OB-GYN) who practices in a suburb outside of Chicago. An OB-GYN provides medical care to women. The obstetric portion of the practice relates to pregnancy; the gynecological portion of the practice relates to female patients who are not pregnant.

¶40 As to his obstetrics practice, Dr. Wener estimated that he has delivered between 7,500 and 8,000 babies and has encountered between 37 and 40 instances of shoulder dystocia in his 36-year career.

¶41 In addition to private practice, Dr. Wener has taught medical students and residents and was chairman of the obstetrics-gynecology department at a hospital for about 20 years. As chairman, he was responsible for the quality of care provided by physicians practicing in his department, and he sat on the medical executive committee of the hospital. He further testified that he examines medical records for both plaintiff and defense attorneys. Dr. Wener is a member of the American College of Obstetricians and Gynecologists.

¶42 Dr. Wener did not preface each of his statements with the words "a reasonable family doctor practicing obstetrics."

13

The clear inference from Dr. Wener's testimony, taken as a whole, is that he was setting forth and applying a standard of reasonable care for prenatal care and delivery applicable to a family practitioner practicing obstetrics.  Furthermore, the jury instructions declared that the burden was on Braylon to prove that the defendant doctor was negligent and that the defendant doctor had to conform to the standard of care "which reasonable family practice doctors practicing obstetrics would exercise in the same or similar circumstances."  See ¶31, supra.

¶43  Dr. Wener's experience and testimony demonstrate that he is familiar with the standard of reasonable care for family practice doctors practicing obstetrics.

¶44  Dr. Wener concluded that the defendant doctor in the instant case breached the standard of reasonable care in several respects. He testified that several risk factors should have alerted the defendant doctor to the risk of shoulder dystocia, such as the pre-pregnancy weight of the mother and the weight she gained during pregnancy, the risk of gestational diabetes, and the risk of a large baby.

¶45  In Dr. Wener's opinion, these three interrelated risk factors were important because, added together, they increased the risk of shoulder dystocia.  Dr. Wener explained, "A doctor has to take care of every patient individually.  And in doing so there are risk factors that every patient has.  And you have to look at the patient as a whole and look at all of the risk factors as they are applicable to the patient."  Dr. Wener opined to a reasonable degree of medical certainty that, based

14

on his education, training, experience, and the facts of the instant case, it was more likely than not that the mother was a gestational diabetic because of her weight and a one-hour glucose test result of 131 mg/dL.

¶46 Dr. Wener asserted that the defendant doctor fell below the standard of reasonable care for a family practice doctor practicing obstetrics by failing to order a three-hour glucose test for Braylon's mother. Dr. Wener concluded that the standard of reasonable care required a three-hour test when the result from the one-hour test was over 130 mg/dL and the mother was obese. The three-hour glucose test would have been more likely to diagnose gestational diabetes, a condition associated with increased risk of shoulder dystocia.

¶47 Dr. Wener also gave his opinion to a reasonable degree of medical certainty that, in view of the mother's size and the one-hour test result, the defendant doctor breached the standard of reasonable care for a family practice doctor practicing obstetrics by failing to perform an ultrasound on Braylon's mother immediately prior to delivery. An ultrasound, in Dr. Wener's opinion, would have given the defendant doctor a better estimate of Braylon's fetal weight and whether Braylon was macrosomic (that is, a large baby), a condition that Dr. Wener associated with a greater risk of shoulder dystocia.

¶48 In addition, Dr. Wener testified that the defendant doctor's use of vacuum assistance during the birthing process breached the standard of reasonable care by increasing the risk of shoulder dystocia. Explaining that it is risky to use the

15

vacuum on a patient exhibiting the risk factors that Braylon's mother exhibited, Dr. Wener opined——to a reasonable degree of medical certainty——that a vacuum should not have been applied at all in the instant case.

¶49 Dr. Wener also testified to a reasonable degree of medical certainty that the defendant doctor breached the standard of reasonable care for a family practice doctor practicing obstetrics by applying excessive traction beyond what the fetus could withstand in attempting to resolve the shoulder dystocia and that this excessive traction (not the mother's pushing) had a causative effect on Braylon's brachial plexus injury.

D

¶50 With the substance of Dr. Wener's testimony in mind, we turn to the reliability standard governing the admission of expert evidence set forth in the 2011 amendment to Wis. Stat. § 907.02(1). The following emphasized language in Wis. Stat. § 907.02(1) adopting the reliability standard was added in 2011.

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if the testimony is based upon sufficient facts or data, the testimony is the product of reliable principles and methods, and the witness has applied the principles and methods reliably to the facts of the case.

¶51 The 2011 amendment to Wis. Stat. § 907.02(1) changed the law to mirror Federal Rule of Evidence 702, which codifies

Daubert v. Merrell Dow Pharmaceuticals Inc., 509 U.S. 579 (1993), and its progeny.[7]

¶52 Before 2011, when the legislature adopted the Daubert reliability standard in amended Wis. Stat. § 907.02(1), Wisconsin case law applied the "relevancy test" to the admission of expert evidence: Expert evidence was admissible if the witness was qualified, the evidence assisted the trier of fact, and the evidence was relevant.[8]

¶53 Wisconsin case law had rejected both Frye's "general acceptance test"[9] and the federal Daubert reliability standard.[10]

---

[7] See 2011 WI Act 2, WI S. Amend. Memo, 2011 Jan. Spec. Sess. S.B. 1 ("This language [in Wis. Stat. § 907.02(1)] is identical to the language of Rule 702 of the Federal Rules of Evidence."); State v. Giese, 2014 WI App 92, ¶17, 356 Wis. 2d 796; 854 N.W.2d 687 ("In January 2011, the legislature amended § 907.02 to make Wisconsin law on the admissibility of expert testimony consistent with 'the Daubert reliability standard embodied in Federal Rule of Evidence 702.'") (quoting State v. Kandutsch, 2011 WI 78, ¶26 n.7, 336 Wis. 2d 478, 799 N.W.2d 865).

[8] For discussion of pre-Daubert Wisconsin case law, see Daniel D. Blinka, Expert Testimony and the Relevancy Rule in the Age of Daubert, 90 Marq. L. Rev. 173 (2006).

[9] Frye v. United States, 293 F. 1013, 1014 (D.C. Cir. 1923), stated the rule as follows:

> The rule is that the opinions of experts or skilled witnesses are admissible in evidence in those cases in which the matter of inquiry is such that inexperienced persons are unlikely to prove capable of forming a correct judgment upon it . . . .
>
> . . . .
>
> [W]hile courts will go a long way in admitting expert testimony deduced from a well-recognized scientific

(continued)

17

¶54 Professor Daniel Blinka concludes that Daubert "created a reliability standard that is less a bright-line test, as it is often assumed to be, and more an evidentiary porridge."[11]

¶55 The instant case is this court's first occasion to apply amended Wis. Stat. § 907.02(1). We do not write on a blank slate. Wisconsin Stat. § 907.02(1) mirrors Federal Rule of Evidence 702 as amended in 2000,[12] and we may look for

---

principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs.

[10] A law student commentator concluded that the Wisconsin Supreme Court nudged the relevancy standard closer to Daubert to the point that the relevancy standard became "Daubert lite," citing State v. Hibl, 2006 WI 52, ¶52, 290 Wis. 2d 595, 714 N.W.2d 194 (explaining that circuit courts have a limited gatekeeping function because the relevancy test requires a showing that the expert's opinion was "reliable enough to be probative"). Kristen Irgens, Wisconsin Is Open for Business or Business Just as Usual? The Practical Effects and Implications of 2011 Wisconsin Act 2, 2012 Wis. L. Rev. 1245, 1256-57.

[11] Blinka, supra note 5, at 19 ("[The Daubert reliability standard] is purportedly more liberal than the once-dominant general acceptance test ('too cold') yet more demanding than the relevancy standard ('too hot').").

The post-Daubert case law indicates that rejecting expert testimony is "the exception rather than the rule." See Federal Rule Evidence 702 Advisory Committee Note (2000).

[12] In 2000, the following underlined language was added to Federal Rule of Evidence 702 to reflect Daubert:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill,

(continued)

guidance and assistance in interpreting and applying § 907.02(1)

to the Daubert case and its progeny, to the Advisory Committee

---

experience,    training,    or    education,    may    testify
thereto  in  the  form  of  an  opinion  or  otherwise-., if
(1)  the  testimony  is  based  on  sufficient  facts  or
data,  (2)  the  testimony  is  the  product  of  reliable
principles  and  methods,  and  (3)  the  witness  has
applied  the  principles  and  methods  reliably  to  the
facts of the case.

Federal  Rule  of  Evidence  702  was  also  amended  in  2011  "as
part  of  the  restyling  of  the  Evidence  Rules  to  make  them  more
easily  understood  and  to  make  style  and  terminology  consistent
throughout  the  rules,"  but  no  substantive  changes  were  intended.
Federal Rule of Evidence 702 Committee Notes (2011).

Federal Rule of Evidence 702 now provides:

A  witness  who  is  qualified  as  an  expert  by  knowledge,
skill,  experience,  training,  or  education  may  testify
in  the  form  of  an  opinion  or  otherwise  if:

(a)  the  expert's  scientific,  technical,  or  other
specialized  knowledge  will  help  the  trier  of  fact  to
understand  the  evidence  or  to  determine  a  fact  in
issue;

(b)  the  testimony  is  based  on  sufficient  facts  or
data;

(c)  the  testimony  is  the  product  of  reliable
principles and methods; and

(d)  the  expert  has  reliably  applied  the  principles  and
methods  to  the  facts  of  the  case.

19

Notes to Federal Rule of Evidence 702,[13] and to federal and state cases interpreting the text of Rule 702 or an analogous state law. The federal or state interpretations, however, are not necessarily dispositive.[14]

¶56 As we have previously noted, the federal reliability standard for the admissibility of expert evidence is explained in Daubert. After Daubert, the United States Supreme Court decided General Electric Co. v. Joiner, 522 U.S. 136 (1997), and Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137 (1999). This trilogy of cases delineated the contours of the reliability standard.

¶57 In Daubert——a products liability case——the Court rejected Frye's general acceptance test and concluded that Federal Rule of Evidence 702 contemplates that trial courts have a gatekeeping obligation. This gatekeeping obligation

---

[13] Under the Rules Enabling Act, 28 U.S.C. § 2072, the United States Supreme Court is authorized to promulgate rules of practice and procedure for the federal courts. This authority is exercised by the Judicial Conference of the United States. The Conference promulgates and changes rules of practice and procedure in the federal courts subject to oversight by the Court. For the Federal Rules of Evidence, the Judicial Conference is aided in its rule-making powers by the Evidence Advisory Committee; the members of and reporter to this Committee are appointed by the Chief Justice of the United States Supreme Court. Paul R. Rice and Neals-Erik William Delker, Federal Rules of Evidence Advisory Committee: A Short History of Too Little Consequence, 191 F.R.D. 678, 679 (2000).

[14] State v. Poly-America, Inc., 164 Wis. 2d 238, 246, 474 N.W.2d 770 (1991) ("When a state statute is modeled after a federal rule, we look to the federal interpretation of that rule for guidance and assistance.").

"assign[s] to the trial court the task of ensuring that a scientific expert is qualified" and that his or her "testimony both rests on a reliable foundation and is relevant to the task at hand." Daubert, 509 U.S. at 597.

¶58 In the instant case, the parties challenge the reliability of Dr. Wener's expert medical testimony.[15] We therefore focus our discussion on the reliability prong of Wis. Stat. § 907.02(1), specifically the reliability of the methods used by Dr. Wener.[16] The trial court must be satisfied that the testimony is reliable by a preponderance of the evidence. Daubert, 509 U.S. at 593; Wis. Stat. § 901.04.

---

[15] The parties do not dispute that Dr. Wener was qualified as an expert and that his opinion was relevant in the instant case.

[16] Wisconsin Stat. § 907.02(1) states that testimony must be based on "reliable principles and methods." Only Dr. Wener's "method" is challenged in the instant case. For an illustration of the difference between principles and methods, the Federal Rule of Evidence 702 Advisory Committee Note (2000) gives the following illustration:

> For example, when a law enforcement agent testifies regarding the use of code words in a drug transaction, the principle used by the agent is that participants in such transactions regularly use code words to conceal the nature of their activities. The method used by the agent is the application of extensive experience to analyze the meaning of the conversations. So long as the principles and methods are reliable and applied reliably to the facts of the case, this type of testimony should be admitted.

Several cases tend to collapse principles and methods into a singular "reliability" analysis.

21

¶59 <u>Daubert</u> makes the trial court a gatekeeper, not a fact finder. When credible, qualified experts disagree, a litigant is entitled to have the jury, not the trial court, decide which expert to believe. <u>Dorn v. Burlington N. Santa Fe R.R. Co.</u>, 397 F.3d 1183, 1196 (9th Cir. 2005).[17]

¶60 Although the <u>Daubert</u> Court focused its discussion on scientific testimony, the Supreme Court later clarified that <u>Daubert</u>'s inquiry applies not just to scientific evidence, but to all expert opinions, "whether the testimony reflects scientific, technical, or other specialized knowledge." <u>Kumho Tire</u>, 526 U.S. at 149.

¶61 The reliability standard "entails a preliminary assessment of whether the reasoning or methodology is scientifically valid." <u>Daubert</u>, 509 U.S. at 592-93. Reliability depends "solely on principles and methodology, not

---

[17] "Experts often disagree. A trial court's determination that the proffered testimony of one expert witness is reliable and helpful does not necessarily mean that the contradictory testimony of another witness, concerning the same subject matter by using a different methodology, is not also reliable and helpful." 4 Jack B. Weinstein, <u>Weinstein's Federal Evidence</u> § 702.05[3] (2d ed. 2011), citing Federal Rule of Evidence 702 Committee Note (2000).

"Since its inception, the courts have sought to apply Rule 702 in a manner that preserves the jury's traditional power to weigh evidence and determine witness credibility." 29 Charles Alan Wright & Victor Gold, <u>Federal Practice and Procedure: Evidence</u>, § 6268.2 (2d ed. 2016), citing <u>DiCarlo v. Keller Ladders, Inc.</u>, 211 F.3d 465, 468 (8th Cir. 2000).

22

on the conclusions that they generate." Daubert, 509 U.S. at 595.

¶62 To guide the reliability analysis, the Daubert court provided a nonexhaustive[18] list of factors that make scientific evidence sufficiently reliable for admission: "(1) whether the methodology can and has been tested; (2) whether the technique has been subjected to peer review and publication; (3) the known or potential rate of error of the methodology; and (4) whether the technique has been generally accepted in the scientific community." Heller v. Shaw Indus., Inc., 167 F.3d 146, 152 (3d Cir. 1999), citing Daubert, 509 U.S. at 592-93.

¶63 The Federal Rules Advisory Committee added five factors to those stated in Daubert to guide decisions about reliability:

(1) Whether experts are "proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying. Daubert v. Merrell Dow Pharmaceuticals, Inc., 43 F.3d 1311, 1317 (9th Cir. 1995).

(2) Whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion. See General Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997) (noting that in some cases a trial court "may conclude that there is simply too great an analytical gap between the data and the opinion proffered").

---

[18] "Many factors will bear on the inquiry, and we do not presume to set out a definitive checklist or test." Daubert, 509 U.S. at 593.

(3) Whether the expert has adequately accounted for obvious alternative explanations. See Claar v. Burlington N.R.R., 29 F.3d 499 (9th Cir. 1994) (testimony excluded where the expert failed to consider other obvious causes for the plaintiff's condition). Compare Ambrosini v. Labarraque, 101 F.3d 129 (D.C. Cir. 1996) (the possibility of some uneliminated causes presents a question of weight, so long as the most obvious causes have been considered and reasonably ruled out by the expert).

(4) Whether the expert "is being as careful as he would be in his regular professional work outside his paid litigation consulting." Sheehan v. Daily Racing Form, Inc., 104 F.3d 940, 942 (7th Cir. 1997). See Kumho Tire Co. v. Carmichael, 119 S. Ct. 1167, 1176 (1999) (Daubert requires the trial court to assure itself that the expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field").

(5) Whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give. See Kumho Tire Co. v. Carmichael, 119 S. Ct. 1167, 1175 (1999) (Daubert's general acceptance factor does not "help show that an expert's testimony is reliable where the discipline itself lacks reliability, as for example, do theories grounded in any so-called generally accepted principles of astrology or necromancy."); Moore v. Ashland Chemical, Inc., 151 F.3d 269 (5th Cir. 1998) (en banc) (clinical doctor was properly precluded from testifying to the toxicological cause of the plaintiff's respiratory problem, where the opinion was not sufficiently grounded in scientific methodology); Sterling v. Velsicol Chem. Corp., 855 F.2d 1188 (6th Cir. 1988) (rejecting testimony based on "clinical ecology" as unfounded and unreliable)."[19]

¶64 Considering the broad range of cases in which expert evidence arises, courts have not been constrained by the listed

---

[19] See commentary following the 2000 amendment to Federal Rule of Evidence 702. See also Blinka, supra note 5, at 19.

factors. How courts apply these factors necessarily varies case by case, expert by expert. "Too much depends upon the particular circumstances of the particular case at issue" to impose hard and fast rules. Kumho Tire, 526 U.S. at 150. A trial court conducts its reliability analysis with wide latitude.[20] Kumho Tire emphasized that the application of the Daubert factors is a flexible inquiry: "[T]he law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination." Kumho Tire, 526 U.S. at 142.

¶65 Thus, the trial court may consider some, all, or none of the factors listed to determine whether the expert evidence is reliable. Federal Rule of Evidence 702 Advisory Committee's Note (2000).

¶66 Because the instant case involves expert medical testimony based on a witness's personal experiences, we discuss the reliability of expert medical opinion based on the expert's personal experiences.

---

[20] "[W]e conclude that the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable. That is to say, a trial court should consider the specific factors identified in Daubert where they are reasonable measures of the reliability of expert testimony." Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 152 (1999) (emphasis added). "[W]hether Daubert's specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine." Kumho Tire, 526 U.S. at 153.

¶67 *Daubert* affirms that experience-based expert evidence may pass muster as a method under the reliability requirement. Though the *Daubert* Court stated that "[p]roposed testimony must be supported by appropriate validation——i.e., 'good grounds,' based on what is known," the Court also stated that the very structure of the rules of evidence suggest that experience can be "good grounds." *Daubert*, 509 U.S. at 590.

¶68 *Daubert*'s reference to the structure of the rules of evidence was a reference to the evidentiary rule that all witnesses except experts generally must have firsthand knowledge of the events to which they testify.[21] The *Daubert* court inferred that this "relaxation of the usual requirement of firsthand knowledge . . . is premised on an assumption that the expert's opinion will have a reliable basis in the knowledge and experience of this discipline." *Daubert*, 509 U.S. at 592.

¶69 Likewise, the *Kumho Tire* Court explicitly recognized that in some cases, "the relevant reliability concerns will focus upon personal knowledge or experience." *Kumho Tire*, 526 U.S. at 150.

¶70 In *Kumho Tire*, the United States Supreme Court specifically addressed the application of the *Daubert* reliability analysis to experience-based, non-scientific expert testimony. The Court required a witness relying on experience

---

[21] *Compare* Federal Rule of Evidence 701 (firsthand knowledge requirement for witnesses) *with* Federal Rule of Evidence 703 (no firsthand knowledge requirement for experts).

26

to offer some articulated rationale supporting his or her opinion. This Kumho Tire requirement is not "impossibly demanding."[22]

¶71 The Kumho Tire Court recognized that "there are many different kinds of experts, and many different kinds of expertise," Kumho Tire, 526 U.S. at 150, so the factors set forth in Daubert and Kumho Tire "may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." Kumho Tire, 526 U.S. at 150.

¶72 The Kumho Tire Court emphasized that in the case of a non-scientific expert, "the relevant reliability concerns may focus upon personal knowledge or experience." Kumho Tire, 536 U.S. at 150. The point, according to Kumho Tire, is to ensure that an expert, "whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Kumho Tire, 526 U.S. at 152.[23]

---

[22] Blinka, supra note 5, at 61

[23] See also Rosen v. Ciba-Geigy Corp., 78 F.3d 316, 318 (7th Cir. 1996) (The purpose of the rule announced in Daubert "was to make sure that when scientists testify in court they adhere to the same standards of intellectual rigor that are demanded in their professional work.").

(continued)

¶73 The Federal Advisory Committee Note to the 2000 Amendment to Rule 702 also recognizes that expert evidence based on personal experiences can meet the reliability test and offers the following general guidance for evaluating experience-based testimony:

> If the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.[24]

¶74 The trial court's gatekeeping function in regard to experience-based testimony, however, "requires more than simply 'taking the expert's word for it.'"[25]

¶75 An expert cannot establish that a fact is generally accepted merely by saying so.[26] Trial courts do not have "to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert." Such an application is

---

"Kumho at least made it clear that, in addition to gauging reliability in light of factors specific to the area of expertise involved, a trial court also may consider whether the expert's testimony holds together based on logic and common sense." 29 Wright & Gold, supra note 17, § 6267.

[24] Federal Rule of Evidence 702 Advisory Committee Note (2000).

[25] Federal Rule of Evidence 702 Advisory Committee Note (2000).

[26] "A supremely qualified expert cannot waltz into the courtroom and render opinions unless those opinions are based upon some recognized scientific method and are reliable and relevant under the test set forth by the Supreme Court in Daubert." Clark v. Takata Corp., 192 F.3d 750, 759 n.5 (7th Cir. 1999).

unreliable because "there is simply too great an analytical gap between the data and the opinion offered." Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997).

¶76 Thus, for example, a federal district court excluded proffered expert testimony because the witness's experience was not extensive enough to indicate reliability for testimony based on personal experience. The expert's "sample size" (himself alone) was too small:

> Essentially, his proposed testimony boils down to the conclusion that because he has been able to perform police work successfully despite his monocular vision, then the Plaintiff will likewise be successful. This is a leap of faith that the Court is unwilling to make, as there is nothing inherent about [the witness's] own personal experience as a monocular visioned person which logically or scientifically leads to a supportable conclusion that other persons with monocular vision necessarily, or even probably, would have the same abilities that he has.

Trevino v. City of Rock Island Police Dep't, 91 F. Supp. 2d 1204, 1207 (C.D. Ill. 2000).[27]

¶77 Case law demonstrates, nonetheless, that courts frequently admit experience-based testimony, especially when

---

[27] Even when expert testimony relies on adequate principles, trial courts may still exclude the testimony when the methodology used to reach a conclusion based on those principles is unsupported. McGovern ex rel. McGovern v. Brigham & Women's Hosp., 584 F. Supp. 2d 418, 425-26 (D. Mass. 2008) (excluding expert's "opinion [that was] was connected to existing data about the risk of stroke after vacuum extraction only by his own ipse dixit."). The reliability standard requires an explanation of how the methodology used by the expert is derived from the witness's experience and led to the conclusion reached. McGovern, 384 F. Supp. 2d at 426.

expert medical evidence is offered. Expert medical opinion based on experience alone, "or experience in conjunction with other knowledge, skill, training or education" may constitute a reliable basis.[28] "In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony."[29]

¶78 Medicine is an example of such a field because medicine "is based on specialized as distinguished from scientific knowledge."[30] When evaluating specialized or technical expert opinion testimony, "the relevant reliability concerns may focus upon personal knowledge or experience." Kumho Tire, 526 U.S. at 150.

¶79 The classic medical school texts explain that medicine is scientific but not entirely a science.[31] "Medicine is not a science but a learned profession, deeply rooted in a number of sciences and charged with the obligation to apply them for man's benefit."[32] Much of medical decision-making relies on judgment

---

[28] Blinka, supra note 5, at 60 (quoting Federal Rule of Evidence 702 Advisory Committee Note (2000)).

[29] Federal Rule of Evidence 702 Advisory Committee Note (2000).

[30] Sullivan v. U.S. Dep't of the Navy, 365 F.3d 827, 834 (9th Cir. 2004).

[31] Primiano v. Cook, 598 F.3d 558, 565 (9th Cir. 2010).

[32] Primiano v. Cook, 598 F.3d at 565 (quoting the "classic medical school text" Cecil Textbook of Medicine 1 (James B. Wyngaarden & Lloyd H. Smith Jr. eds., 17th ed. 1985)).

and is difficult to quantify or even to assess qualitatively. In medicine, "knowledge is often uncertain," "[t]he human body is complex," and "etiology is often uncertain."[33] Furthermore, practical and ethical concerns prevent "studies calculated to establish statistical proof."[34] Physicians must use their knowledge and experience as a basis for weighing known factors along with "inevitable uncertainties" to "mak[e] a sound judgment."[35]

¶80 That Daubert lends its analysis more favorably to more objective sciences does not bar the testimony of physicians applying their experience and clinical methods.[36] That the knowledge is uncertain "does not preclude the introduction of

---

[33] United States v. Sandoval-Mendoza, 472 F.3d 645, 655 (9th Cir. 2006).

[34] Sandoval-Mendoza, 472 F.3d at 655.

[35] Primiano, 598 F.3d at 565 (quoting the "classic medical school text" Harrison's Principles of Internal Medicine 3 (Dennis L. Kasper et al. eds., 16th ed. 2005)).

[36] See, e.g., 29 Wright & Gold, supra note 17, § 6269.8 (medical expert "opinion[s] also may be based on extensive personal observations, professional experience, education, and training even where the medical expert has not conducted an epidemiological study and even where the expert's opinion is not generally accepted and is unsupported by peer review"); Sandoval-Mendoza, 472 F.3d at 656 (a well qualified physician with sufficient expertise could reliably testify about defendant's brain tumor to establish an entrapment defense); Primiano, 598 F.3d at 568 (abuse of discretion to exclude doctor's testimony in products liability case based on his experiences alone, but noting that medical literature had not addressed a similar situation).

31

medical expert opinion testimony when medical knowledge permits the assertion of a reasonable opinion."[37]

¶81 "A trial court should admit medical expert testimony if physicians would accept it as useful and reliable."[38] In other words, expert medical opinion testimony is reliable if the knowledge underlying it "has a reliable basis in the knowledge and experience of the [relevant] discipline."[39]

¶82 In Schneider ex rel. Estate of Schneider v. Fried, 320 F.3d 396, 406 (3d Cir. 2003), the federal Third Circuit Court of Appeals explained that a physician's "experience render[ed] his testimony reliable [and] demonstrate[d] that his testimony [was] based on 'good grounds.'" In light of his considerable professional experience, the physician's testimony on the standard of care was reliable, even if the content of the literature cited was irrelevant. The federal court of appeals

---

[37] Sandoval-Mendoza, 472 F.3d at 655 (internal quotation marks & quoted source omitted).

[38] Sandoval-Mendoza, 472 F.3d at 655.

[39] Sandoval-Mendoza, 472 F.3d at 655 (quoting Kumho Tire, 526 U.S. at 149 (quoting Daubert, 509 U.S. 579, 592)); Zuchowicz v. United States, 140 F.3d 381 (2d Cir. 1998) (district court had discretion to admit opinions of clinical medical experts about cause of plaintiff's disease because they were based on methods reasonably relied on by clinical physicians, even though the drug had not been previously linked to that disease).

"In a non-scientific context, the reliability of an expert's methodology often will be a function of accepted practice in the area of expertise in question." 29 Wright & Gold, supra note 17, § 6268.1.

32

concluded that the magistrate judge abused his discretion by excluding the expert testimony.[40]

¶83 The Schneider court stated that expert testimony does not have to be subject to peer review to be admitted under Rule 702; the physician's experience renders his or her testimony reliable and demonstrates that the testimony is based on good grounds.[41] The court recognized, however, that the degree to which the medical expert is qualified implicates the reliability of the testimony. Schneider, 320 F.3d at 406.

¶84 Similarly, the federal Sixth Circuit Court of Appeals held that a district court abused its discretion by excluding a physician's testimony based on extensive, relevant experience when the physician had not cited medical literature supporting

---

[40] Schneider ex rel. Estate of Schneider v. Fried, 320 F.3d 396 (3rd Cir. 2003), involved a claim that a decedent received cardiac care that fell below the standard of care. The court provided the following discussion in regard to this expert:

> The record establishes that as an invasive cardiologist, who normally diagnoses heart conditions, Dr. Semigran was routinely present during surgical procedures and regularly advised interventional cardiologists during the course of those procedures. Dr. Semigran also testified that he would consult with interventional cardiologists about which drugs should or should not be given to patients undergoing angioplasties.

Schneider, 320 F.3d at 406.

[41] Daubert, 509 U.S. at 590 ("Proposed testimony must be supported by appropriate validation——i.e., good grounds . . . .").

his view. Dickenson v. Cardiac & Thoracic Surgery of E. Tenn., 388 F.3d, 976, 980 (6th Cir. 2004). Requiring an expert to demonstrate a familiarity with accepted medical literature or published standards in order for the testimony to be reliable in the sense contemplated by Federal Rule of Evidence 702 is an erroneous statement of the law. Dickenson, 388 F.3d at 980-81 (citing Federal Rule of Evidence 702, Advisory Committee Note expressly contemplating that an expert may testify on the basis of experience).[42]

---

[42] Kumho Tire, 526 U.S. 137, 156 ("[N]o one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience."); Feliciano-Hill v. Principi, 439 F.3d 18, 24-25 (1st Cir. 2006) (physician's expert testimony met Daubert/Rule 702 standards even though he failed to support his diagnosis with citations to published authorities; physician offered a "routine diagnosis" on patient he had examined, related to common condition well within his expertise); Bonner v. ISP Techs., Inc., 259 F.3d 924, 929 (8th Cir. 2001) ("There is no requirement that a medical expert must always cite published studies on general causation in order to reliably conclude that a particular object caused a particular illness." (internal quotation marks & quoted source omitted)).

(continued)

¶85 The case law teaches that Daubert's role of ensuring that the courtroom door remains closed to junk science is not served by excluding medical expert testimony that is supported by extensive relevant medical experience.[43] Such exclusion is rarely justified in cases involving medical experts. Dickenson, 388 F.3d at 981. See also Daniel W. Shuman, Expertise in Law, Medicine, and Health Care, 27 J. Health Pol., Pol'y & L. 267

---

The defendants cite several cases for the proposition that to offer reliable testimony, Dr. Wener should have based his testimony on medical literature. The cases are distinguishable from the instant case. For example, although the court noted in Berk v. St. Vincent's Hospital & Medical Center, 380 F. Supp. 2d 334 (S.D.N.Y. 2005), that the excluded expert cited "no germane medical literature," the expert's report was excluded for other reasons: the expert's report was unsworn, was based on incorrect factual assumptions, and offered no methodology other than the expert's say-so. Berk, 380 F. Supp. 2d at 354-56. In contrast, Dr. Wener's testimony was given under oath; Dr. Wener relied on Braylon's and his mother's medical reports; Dr. Wener offered a clinical methodology that applied accepted risk factors to the facts of the instant case; and the defendants' experts offered testimony that actually supported Dr. Wener's testimony.

[43] The phrase "junk science" is ordinarily used as an epithet to refer to research or information that is not credible. See Kumho Tire, 526 U.S. at 159 (Scalia, J., concurring) (Kumho makes clear that the discretion it endorses is "discretion to choose among reasonable means of excluding expertise that is fausse and science that is junky.").

(2001) (characterizing the effect of <u>Daubert</u> and <u>Kumho</u> cases on claims of medical expertise as "much ado about little").[44]

¶86 Instead of exclusion, the appropriate means of attacking "shaky but admissible" experience-based medical expert testimony is by "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof . . . ." <u>Daubert</u>, 509 U.S. at 597.

---

[44] The Wisconsin Medical Society and American Medical Association filed an amicus brief urging that this court "recognize that medical opinions supported by unsystematic clinical observations have reliability limited to those situations where physicians would not be expected to produce extrinsic support for their contentions but presumptively fail to cross the <u>Daubert</u> reliability threshold when tendered to establish the standard of care in a medical negligence claim." <u>See</u> Brief of Amicus Curiae Wisconsin Medical Society & American Medical Association at 9-10.

This argument is not supported in the case law. Expecting on-point medical literature to define a physician's standard of care in the penumbra of clinical situations is unreasonable. <u>See</u> Michelle M. Mello, <u>Using Statistical Evidence to Prove the Malpractice Standard of Care: Bridging Legal, Clinical, and Statistical Thinking</u>, 37 Wake Forest L. Rev. 821, 857 (2002). The author states:

> For clinical scenarios involving a high degree of independent judgment and careful attention to the individual characteristics of each patient, expert opinion testimony tailored to the particular situation at issue in the malpractice case truly does have an advantage over reliance on practice guidelines or other standards formulated ex ante[,] . . . derived from a population of patients that may not resemble the plaintiff . . . .

<u>Id.</u> at 846.

Once evaluated and deemed sufficiently reliable for admission, that expert opinion [based on personal experience] is submitted to the "capabilities of the jury and of the adversary system generally."

Lapsley v. Xtek, Inc., 689 F.3d 802, 810 (7th Cir. 2012) (citing Daubert, 509 U.S. at 596).[45]

E

¶87 Our next task is to determine the standard for reviewing the circuit court's gatekeeping determination under Wis. Stat. § 907.02(1). We refer to federal law to guide our analysis of the standard for review.

¶88 We examine the circuit court's rulings both independently as a question of law and also under the erroneous exercise of discretion standard.

¶89 The interpretation and application of a statute presents a question of law that this court decides independently of the circuit court and court of appeals but benefiting from their analyses. State v. Steffes, 2013 WI 53, ¶15, 347 Wis. 2d 683, 832 N.W.2d 101. It follows that this court decides whether the circuit court applied the proper legal standard under Wis. Stat. § 907.02(1) in the first instance independently of the circuit court and the court of appeals but benefiting from their analyses. Lees v. Carthage College, 714 F.3d 516, 520 (7th Cir. 2013) ("[w]hether the district court

_____

[45] "Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to burden of proof, not exclusion." Primiano, 598 F.3d at 564 (citing Daubert, 509 U.S. at 596).

applied the appropriate legal framework for evaluating expert testimony is reviewed de novo"); Lewis v. CITGO Petroleum Corp., 561 F.3d 698, 705 (2009) ("we review de novo whether the court employed the correct legal standard in reaching its admissibility decision").

¶90 Once satisfied that the circuit court applied the appropriate legal framework, an appellate court reviews whether the circuit court properly exercised its discretion in determining which factors should be considered in assessing reliability,[46] and in applying the reliability standard to determine whether to admit or exclude evidence under Wis. Stat. § 907.02(1). Gen. Elec. Co. v. Joiner, 522 U.S. 136, 141 (1997).[47]

¶91 Once the circuit court selects the factors to be considered in assessing reliability, the circuit court measures the expert evidence against these factors. The circuit court also determines whether the witness faithfully and properly applied the reliability principles and methodology to the facts of the case.[48]

---

[46] Blinka, supra note 5, at 19 (citing Kumho Tire, 526 U.S. at 152).

[47] "[T]he law grants the district court great discretion regarding the manner in which it conducts that evaluation" of the admissibility of expert testimony. "[W]e have not required that the Daubert inquiry take any specific form . . . ." Lewis v. CITGO Petroleum Corp., 561 F.3d 698, 704 (2009).

[48] Blinka, supra note 5, at 19, 60 (citing Federal Rule Evidence 702 Advisory Committee Note (2000)).

¶92 In other words, a circuit court has discretion in determining the reliability of the expert's principles, methods, and the application of the principles and methods to the facts of the case.[49]

¶93 A trial court's decision on admissibility or exclusion of expert evidence is an erroneous exercise of discretion when a decision rests upon a clearly erroneous finding of fact, an erroneous conclusion of law, or an improper application of law to fact.[50]

---

[49] In Kumho Tire, the Supreme Court held that trial courts have great latitude in determining the methods by which they test the reliability of expert testimony. Indeed the federal abuse of discretion standard "applies as much to the trial court's decisions about how to determine reliability as to its ultimate conclusion." United States v. Charley, 189 F.3d 1251, 1261 n.11 (10th Cir. 1999) (quoting Kumho Tire, 526 U.S. at 152). "[T]he law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination." Kumho Tire, 526 U.S. at 142. See also Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997) ("abuse of discretion is the proper standard by which to review a district court's order to admit or exclude scientific evidence.").

"Our case law has recognized that experts in various fields may rely properly on a wide variety of sources and may employ a similarly wide choice of methodologies in developing an expert opinion." Cooper v. Carl A. Nelson & Co., 211 F.3d 1008, 1020 (7th Cir. 2000).

[50] The federal cases state: "An abuse of discretion may occur as a result of an errant conclusion of law, an improper application of law to fact, or a clearly erroneous finding of fact." McDowell v. Philadelphia Housing Auth., 423 F.3d 233, 238 (3d Cir. 2005).

(continued)

F

¶94 Against this backdrop of the teachings about the reliability of expert medical testimony based on personal experiences and the standards for appellate review of a circuit court's determination of reliability, we decide whether the circuit court erred in admitting Dr. Wener's testimony. We conclude, as did the court of appeals, that the circuit court did not erroneously exercise its discretion in admitting Dr. Wener's testimony as reliable under Wis. Stat. § 907.02(1).

¶95 In the first instance, we note, as a matter of law, that the circuit court applied the proper reliability standard under Wis. Stat. § 907.02(1).

---

In Wisconsin, the cases use the phrase "erroneous exercise of discretion" in place of the phrase "abuse of discretion." The two phrases are equivalent. We did not change the standard of review, just the locution. We concluded that the term "abuse of discretion" carries unjustified negative connotations. City of Brookfield v. Milwaukee Metro. Sewerage Dist., 171 Wis. 2d 400, 423, 491 N.W.2d 484, 493 (1992). See King v. King, 224 Wis. 2d 235, 248, 590 N.W.2d 480 (1999) ("A circuit court erroneously exercises its discretion if it makes an error of law or neglects to base its decision upon facts in the record."); Hartung v. Hartung, 102 Wis. 2d 58, 66, 306 N.W.2d 16 (1981):

> A discretionary determination . . . must demonstrably be made and based upon the facts appearing in the record[,] in reliance on the appropriate and applicable law[,] . . . and most importantly, a discretionary determination must be the product of a rational mental process by which the facts of record and law relied upon are stated and are considered together for the purpose of achieving a reasoned and reasonable determination.

¶96 Because the circuit court applied the correct Daubert reliability standard, our review of the circuit court's decision to admit Dr. Wener's testimony is limited to reviewing whether the circuit court erroneously exercised its discretion.  See Cipollone v. Yale Indus. Prods., Inc., 202 F.3d 376, 380 (1st Cir. 2000).

¶97 The circuit court made a good, clear record.  Based on the circuit court's extensive oral rulings on the admissibility of Dr. Wener's testimony as reliable, it is apparent that the circuit court examined federal and state case law applying the Daubert standard to medical expert testimony and fairly considered the defendants' challenges to the admissibility of Dr. Wener's testimony.

¶98 Because the circuit court was careful in exploring the applicable law and in setting out its reasoning, we can more easily review the circuit court's rulings to determine whether the circuit court erroneously exercised its discretion.  We commend the circuit court's efforts and conclude that the circuit court's rulings establishing that Dr. Wener's personal clinical experiences satisfy the reliability requirement, are well reasoned, and are not an erroneous exercise of discretion.

¶99 The defendants make the following three principal arguments supporting their position that Dr. Wener's testimony was unreliable under Wis. Stat. § 907.02(1) and was not applied reliably:

(1)  Dr. Wener's testimony was unreliable under Wis. Stat. § 907.02(1) because Dr. Wener did not apply a sound

41

methodology: Dr. Wener's testimony rested on his qualifications and "personal preferences."

(2) Dr. Wener's testimony was unreliable under Wis. Stat. § 907.02(1) because Dr. Wener did not rely on medical literature or other recognized sources of reliability.

(3) Dr. Wener's application of his opinions to the facts of the case was flawed because Dr. Wener's testimony was internally inconsistent.

¶100 We address each of the defendants' arguments in turn.

(1)

¶101 To use defendants' counsel's words, the defendants' challenge to Dr. Wener's testimony is based on "method, method, method."

¶102 The circuit court ruled that Dr. Wener's testimony satisfied the Wis. Stat. § 907.02(1) reliability standard because his methodology was reliable: Dr. Wener's methodology is a "classic medical methodology," looking at recognized medical indicators.

¶103 The circuit court explained that Dr. Wener's testimony, taken as a whole, demonstrated that Dr. Wener formulated an opinion about the standard of reasonable care of family practice doctors practicing obstetrics on the basis of his experiences, as opposed to simply his own personal preference. Thus, Dr. Wener had a reliable basis for rendering an opinion.

¶104 In contrast, the defendants contend that Dr. Wener was really just opining based on his "personal preferences." The

defendants assert that an expert cannot establish that a fact is generally accepted merely by saying so. They argue that Dr. Wener's testimony had to be based on the methods and procedures of science rather than on his subjective belief or unsupported speculation. According to the defendants, Dr. Wener's opinion about the standard of reasonable care was connected to existing data only by his own ipse dixit.

¶105 The circuit court regarded Dr. Wener's methods as the ordinary methodology of medicine: conscientious use of the thousands of instances in which he had delivered babies and made decisions about the care of individual patients and his teaching and hospital experiences relating to obstetrics. Echoing case law, the circuit court declared that medicine is "not a science, but a learned profession deeply rooted in a number of sciences."

¶106 The circuit court viewed Dr. Wener's methodology as essentially a comparison of the instant case to other deliveries, reasoning that the Daubert factors were not helpful in evaluating this methodology because a medical expert's personal clinical experience is not subject to precise measurements. "[B]ecause the standard of care is determined by the care customarily provided by other physicians, it need not be scientifically tested or proven effective . . . ." Palandjian v. Foster, 842 N.E.2d 916, 921 (Mass. 2006).

¶107 Dr. Wener gave ample testimony about what a family practice doctor practicing obstetrics should have known and how a family practice doctor practicing obstetrics should have acted in the instant case. Dr. Wener's testimony about the standard

43

of reasonable care of family practice doctors practicing obstetrics was based on his knowledge of family practice doctors practicing obstetrics gained through education, his decades of delivering thousands of babies, his repeated observations in decades of clinical experiences, and his numerous teaching and supervisory experiences in important positions in the field of obstetrics and gynecology. He used his many experiences to arrive at an opinion in the instant case that is sufficiently similar to his vast array of clinical experiences over decades of practice.

¶108 Dr. Wener demonstrated to the circuit court that he had formed an opinion about the standard of reasonable care of a family practice doctor practicing obstetrics and that the opinion had a reliable basis.

¶109 The circuit court concluded on the basis of the record and case law that it had adequate grounds to view Dr. Wener's testimony as not subjective belief, unsupported conjecture, or ipse dixit. The circuit court ruled that Dr. Wener's methodology was reliable based on Dr. Wener's extensive personal experiences. In other words, Dr. Wener's testimony was based on "good grounds." Daubert, 509 U.S. at 590.

¶110 Characterizing its pretrial decision as "a close call," and looking at the vagaries of medical treatment and diagnosis, the circuit court concluded that Dr. Wener's testimony was "reliably based on a reliable medical methodology looking at recognized factors of the standard of care."

44

¶111 The circuit court declared that Dr. Wener looked at recognized risk factors and, using his own varied experiences, concluded that the defendant doctor breached the standard of reasonable care by failing to weigh these risk factors. According to the circuit court, Dr. Wener used his knowledge and experience as a basis for weighing known factors along with the inevitable uncertainties to make a sound judgment.  Dr. Wener's testimony was not based on his personal preference, ruled the circuit court; it was based on clinical experience, a reliable methodology.

¶112 The circuit court determined that the way in which Dr. Wener "adds [the factors up] is debatable, but that's not the same as saying the way that Dr. Wener adds them up is not reliable."  According to the circuit court, Dr. Wener explained the bases for his opinions in sufficient detail to permit the jury to evaluate his conclusions.

¶113 The circuit court obviously relied on Daubert case law in making its determination of reliability and used the language and reasoning set forth in the case law to rule on the reliability and admissibility of Dr. Wener's expert medical testimony based on personal experiences.

¶114 The circuit court regarded the defendants' contention that Dr. Wener's opinions are unreliable because they are untestable as failing from the outset.  According to Daubert, testability is not a prerequisite to admission.  Testability, like all of the Daubert factors, is a suggested way to assess methodology, not a required way to assess methodology.

45

¶115 The circuit court ruled that Dr. Wener's testimony was testable and met the Wis. Stat. § 907.02(1) standard. The circuit court reasoned that "the testable principles[ ] are the biological and physiological and anatomical principles that inform the conclusions that arise."

¶116 The circuit court also explained that the defendants could (and did) test Dr. Wener's testimony through cross examination, further explaining that although "medicine is a science, it is not a quantified science. It is not a measurement, in many respects. It is not engineering."

¶117 The circuit court further compared Dr. Wener's testimony with the testimony of defense experts, including Dr. Michelle Grimm, a defense expert on medical engineering, and Dr. Dwight Jonathan Rouse, an obstetrician with additional training in maternal fetal medicine.

¶118 According to the circuit court, some defense expert testimony actually supported Dr. Wener's testimony. For example, both Dr. Wener and the defense expert witnesses testified that applying excessive traction beyond what the fetus can withstand during childbirth violates the standard of reasonable care.

¶119 Accordingly, the circuit court declared that the context of the entire case supported admitting Dr. Wener's testimony as reliable:

> [A]fter the trial there is a lot more context within which to analyze the issues in respect to Dr. Wener's testimony.

46

. . . .

And I still believe that Dr. Wener's testimony met the Daubert standards as that applies to medical testimony.

. . . .

And after trial, Dr. Werner's position looked every bit as good, and better, than it did pretrial when the context of the other experts, Grimm and Rouse, particularly, was taken into account. And so I stand on my prior rulings as to Dr. Wener as supplemented here today with what we know after trial. His testimony was properly admitted, to the extent it was admitted.

¶120 In sum, the circuit court ruled that Dr. Wener's principles and methods were sufficiently reliable to be admitted, emphasizing that Dr. Wener's testimony, although shaky, is not junk science and that Dr. Wener is not a junk scientist:

Dr. Wener's opinions are shaky due to their generality, but I conclude that they are sufficiently reliable to be admitted. The methodology employed is what I will call, I guess, holistic. The defense motion parses out the various factors and how they don't match a body of opinion about that particular factor. . . . [T]he essence of Dr. Wener's opinion [is that] these elements converge and then the sum is greater than the total of the parts, essentially. It's not something that's been peer reviewed or published because it's an individualized determination based upon the facts of this case, and in using known factors.

¶121 We conclude, as did the court of appeals, that the circuit court did not erroneously exercise its discretion when it concluded that the Daubert factors were not helpful and that Dr. Wener's clinical methodology rendered his expert medical

47

testimony on the standard of reasonable care based on his personal experiences reliable under Wis. Stat. § 907.02(1).

¶122 Dr. Wener's opinion based on his personal experiences satisfied the reliability standard. He identified established risk factors (principles). He then used classic, ordinary medical methods to establish the standard of care of a family practice doctor practicing obstetrics and to opine that the defendant doctor breached this standard.

¶123 In the instant case, the reliability standard entails the circuit court's assessment of methodology. In expert medical evidence, the methodology often relies on judgment based on the witness's knowledge and experience. Accordingly, reliability concerns may focus on the personal knowledge and experience of the medical expert witness. Dr. Wener's testimony was based on his knowledge of and experience with obstetrics and family practice doctors practicing obstetrics. He gained his knowledge through education, his decades of delivering thousands of babies, his repeated observations during decades of clinical experiences, and his numerous teaching and supervisory experiences in the fields of obstetrics and gynecology. Because Dr. Wener applied an accepted medical method relied upon by physicians and had extensive personal experiences and knowledge pertaining to the standard of reasonable care, the circuit court did not erroneously exercise its discretion in admitting his testimony.

(2)

48

¶124 The defendants argue that Dr. Wener's testimony was mere speculation because it was not supported by even one peer reviewed publication or medical text. The defendants correctly contend, as we stated previously, that an expert cannot establish that a fact is generally accepted merely by saying so.

¶125 With respect to the defendants' arguments that Dr. Wener's testimony was not reliable because he did not rely on medical literature, the circuit court concluded that Dr. Wener's approach is "not something that's been peer reviewed or published because it's an individualized determination based upon the facts of this case, and in using known factors" such as estimated maternal weight, fetal weight, and glucose levels.

¶126 Indeed, on cross-examination Dr. Wener said he was aware of the medical literature but that there was a wide range of statistics in the literature so that the publications were not helpful and did not directly contradict his testimony.

¶127 For example, Dr. Wener concluded that, considering all of the risk factors in totality, the defendant doctor breached the standard of reasonable care by failing to order a three-hour glucose test after the one-hour test's result exceeded 130 mg/dL. The defendants, citing American College of Obstetricians and Gynecologists, Clinical Management Guidelines for Obstetrician-Gynecologists No. 30 (Sept. 2001) (reaffirmed 2008) [hereinafter Guidelines], argued that Dr. Wener's opinion was erroneous because the Guidelines suggest that the reasonable standard of care requires a three-hour test when the mother's one-hour test result exceeds 140 mg/dL. The publication notes,

however, that either the 130 or 140 mg/dL "threshold is acceptable." Guidelines at 762. Furthermore, the publication expressly states that it does not prescribe a standard of care: "These guidelines should not be construed as dictating an exclusive course of treatment or procedure. Variations in practice may be warranted based on the needs of the individual patient, resources, and limitations unique to the institution or type of practice." Guidelines at 759. Dr. Wener's testimony did not directly contradict the guidelines.

¶128 The circuit court did not bar Dr. Wener's testimony on the ground that Dr. Wener did not cite to any publications as support, reasoning that peer-reviewed literature would not be all that useful in the experience-specific methodology that Dr. Wener applied in the instant case.

¶129 The circuit court's conclusion was not an erroneous exercise of discretion. Dr. Wener's failure to rely on literature is no bar to admissibility. Daubert supports the circuit court in the instant case: "Publication (which is but one element of peer review) is not a sine qua non of admissibility; it does not necessarily correlate with reliability." Daubert, 509 U.S. at 593.

(3)

¶130 Reliable application, or "fit," is the final step in the Daubert analysis. The defendants argue that Dr. Wener failed to reliably apply his methodology to the facts.

¶131 The defendants argue that Dr. Wener's "holistic" methodology was unreliable. We have already discussed Dr.

50

Wener's methodology (as part of our analysis of the defendants' objections to Dr. Wener's testimony) and concluded that the circuit court did not err in declaring that Dr. Wener's use of a constellation of factors is reliable, as doctors usually apply this method when treating patients.

¶132 The defendants also contend that Dr. Wener improperly applied his method to the instant case because his testimony was riddled with inconsistencies. The circuit court correctly concluded that inconsistencies do not necessarily render expert testimony unreliable; they go to the weight of the testimony: "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Daubert, 509 U.S. at 596.

¶133 The defendants argue in this court that Dr. Wener's experience-based testimony was not reliably applied, specifically objecting to three of Dr. Wener's opinions related to prenatal care and the delivery of Braylon. The defendants objected to Dr. Wener's statements that the defendant doctor breached the standard of care by failing to order a three-hour glucose test; that the defendant doctor breached the standard of care by failing to perform an ultrasound immediately prior to delivery; and that the defendant doctor breached the standard of care by doing a vacuum-assisted delivery. The defendants again argue that these opinions are personal preferences and that personal preference is not a permissible basis for an expert opinion.

51

¶134 The circuit court reviewed Dr. Wener's discussion of the generally accepted risk factors of shoulder dystocia——elevated birth weight, maternal obesity, and gestational diabetes——and his application of these risk factors, in totality, to the facts of the instant case. The circuit court acknowledged that just as clinical medical practice entails evaluating a specific patient and applying known risk factors or variables, Dr. Wener's testimony analyzed Braylon's mother's prenatal care and the delivery of Braylon with respect to the three risk factors that he adduced at trial. The circuit court did not view Dr. Wener's testimony as stating a personal preference, but as based on reliable medical methods.

¶135 Furthermore, Dr. Wener's testimony regarding threshold glucose levels for gestational diabetes and macrosomia did not necessarily contradict the defendants' experts: Each offered a spectrum of ranges under which the risks warranted special care, and their spectrums overlapped. Any disagreement, ruled the circuit court, goes to the weight of Dr. Wener's testimony, not its admissibility.

¶136 For the reasons set forth by the circuit court, we conclude that the circuit court did not erroneously exercise its discretion in admitting Dr. Wener's testimony as reliable based on personal experiences and that Dr. Wener reliably applied his methodology to the facts. The circuit court kept the gate open

to the opinion of Dr. Wener, a qualified OB-GYN. "[T]rial judges are gatekeepers, not armed guards."[51]

## II

¶137 The second issue we must address is whether three remarks separately or together made by Braylon's counsel during his closing arguments prejudiced the defendants, justifying a new trial. We will set out each of the remarks and address each of the defendants' arguments for a new trial. Ultimately, we agree with the court of appeals that the circuit court properly exercised its discretion by rejecting the defendants' motion for a new trial.

¶138 We begin by noting that although the defendants contemporaneously objected to Braylon's counsel's remarks, the defendants erred by failing to move for a mistrial. Generally, an offended party must object and then move for a mistrial to preserve a challenge to prejudicial remarks. Hansen v. State, 64 Wis. 2d 541, 551-52, 219 N.W.2d 246 (1974). The court of appeals nonetheless addressed this issue by exercising its discretionary authority. Seifert ex rel. Scoptur v. Balink,

---

[51] 29 Wright & Gold, supra note 17, § 6268.2 (citing Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling Co., 161 F.3d 77, 86 (1st Cir. 1998)).

See Guild v. Gen. Motors Corp., 53 F. Supp. 2d 363 (W.D.N.Y. 1999) ("[T]rial judges acting as gatekeepers under Daubert must not assume 'the role of St. Peter at the gates of heaven, performing a searching inquiry into the depth of an expert witness's soul' and thereby usurp 'the ageless role of the jury' in evaluating witness credibility and weight of the evidence." (quoted source omitted)).

2015 WI App 59, ¶36 n.10, 364 Wis. 2d 692, 869 N.W.2d 493 (citing Pophal v. Siverhus, 168 Wis. 2d 533, 545, 484 N.W.2d 555 (Ct. App. 1992)). We do the same.

¶139 We review a circuit court's decision to deny a motion for a new trial under an erroneous exercise of discretion standard.[52] An order for a new trial based on improper statements of counsel is appropriate if it "'affirmatively appear[s]' that the remarks prejudiced the complaining party." Wausau Underwriters Ins. Co. v. Dane Cty., 142 Wis. 2d 315, 329-30, 417 N.W.2d 914 (Ct. App. 1987) (quoting Roeske v. Schmitt, 266 Wis. 557, 572, 64 N.W.2d 394 (1954)). This standard is satisfied when the circuit court is convinced that "the verdict reflects a result which in all probability would have been more favorable to the complaining party but for the improper argument."[53] Related to our review of a circuit court's decision to deny the defendants' motion for a new trial is the assumption that "a properly given admonitory instruction is followed" and that "the jury acted according to law." State v. Pitsch, 124 Wis. 2d 628, 645 n.8, 369 N.W.2d 711 (1985) (citations omitted).

(1)

¶140 The defendants assert that Braylon's counsel made an impermissible and prejudicial reference to the rules of the road

---

[52] Wagner v. Am. Family Mut. Ins. Co., 65 Wis. 2d 243, 249, 222 N.W.2d 652 (1974).

[53] Wagner, 65 Wis. 2d at 249.

during his closing argument.[54] The following is Braylon's counsel's reference to the rules of the road during closing argument:

> Thank you. Okay, well, on a nice, beautiful sunny day, clear skies, 65 miles an hour is probably fine. But there may be factors that you have to consider that would make that not fine. That would make you question whether that's the speed you should be going.
>
> Let's say it's pouring rain, let's say it's snowing. You're not going to look at that number the same. And Dr. Wener, who I'll talk about in a moment, explained that to you. And this is the issue in this case about gestational diabetes.
>
> No one is denying that they're throwing these two numbers out; 130 and 140. But what he tried to explain to you was when you have a big mom, who has an increased risk of gestational diabetes because of her weight, and an increased risk of a big baby because of her weight, you've got to consider which of these numbers you're going to use.
>
> His point was what's safe at one speed might not be at another. And that you have to consider those issues.

¶141 The defendants made timely objections to these statements, which the circuit court overruled. The defendants also challenged these statements in their motion after the verdict. They argued that these statements violated the circuit court's order in limine and that the statements prejudicially confused the jury in regard to the applicable standard of reasonable care. The defendants asserted that as a result of

---

[54] The circuit court granted a motion in limine to prohibit Braylon's counsel from analogizing medical negligence to the failure of a driver to follow the rules of the road.

Braylon's counsel's statements, "the jury was left with the impression that Dr. Wener's opinions regarding standards of care could be equated to speed limits and weather hazards on the roadway."

¶142 The circuit court rejected this argument.  The circuit court decided that Braylon's counsel's analogy to driving a car in various weather conditions did not violate the order in limine.  Instead, the circuit court interpreted Braylon's counsel's statement as "an attempt to analogize and to put into context Dr. Wener's theory of these additive elements as they pile up with the total being more than the sum of its parts," not as an analogy to ordinary negligence.

¶143 Further, in regard to the defendants' concern that the jury was confused as to the applicable standard of reasonable care, the circuit court concluded that the jury was not confused about the standard of care to apply:[55]  The jurors were instructed to "find a standard of care for medical negligence." Jurors are assumed to follow jury instructions.  Accordingly, the circuit court concluded that "there is no reason to believe" Braylon's counsel's statements were prejudicial or could be interpreted by the jury in a way that would violate the in limine order.

---

[55] The circuit court also noted, "We have to remember that the juror's [sic] don't even know what regular negligence is, probably.    They   weren't   instructed   on   regular negligence. . . . They were given one instruction."

56

¶144 The court of appeals agreed with the circuit court and concluded that Braylon's counsel did not violate the circuit court's order in limine and that counsel's analogy to drivers did not prejudice the defendants. The court of appeals reasoned that instead of comparing ordinary negligence and medical negligence, "the analogy illustrated the interplay of the alleged risk factors present in this case through a comparison to the interplay of various weather conditions that might affect a driver's decision-making process."[56]

¶145 Further, the court of appeals concluded that there was no indication that the absence of the analogy would have resulted in a different verdict. The analogy pertained to gestational diabetes testing thresholds, which was just one aspect of the evidence presented to the jury on the issue of the standard of reasonable care. The circuit court instructed the jury that its decision must be based only on the evidence presented to the jury and nothing else, including the statements of counsel.

¶146 We agree with the reasoning and conclusion of the court of appeals.

(2)

¶147 Turning to another remark of Braylon's counsel, the defendants assert that they were prejudiced because Braylon's counsel made an impermissible "Golden Rule" argument in

---

[56] Seifert, 364 Wis. 2d 692, ¶40.

violation of an order in limine. "Golden Rule" arguments arise when counsel asks "the jurors to place themselves in the position of someone claiming injury or damage and ask[s] the jurors what they would want as compensation." State v. DeLain, 2004 WI App 79, ¶23, 272 Wis. 2d 356, 679 N.W.2d 562.

¶148 An order in limine prohibited Braylon's counsel from making statements that might suggest that the jury determine whether medical negligence occurred based on the jurors' own knowledge, experience, common sense, or what they would want or deserve.

¶149 The defendants assert that Braylon's counsel violated the order in limine when he stated:

> Now, you heard some testimony from the defense experts, and I'll talk about them as I go along in this case as well and their bias, where they're coming from. You heard somebody actually get up on the witness stand and say—Dr. Rouse, I think it was—if it was 139, I wouldn't have done anything. Really? If it was 139, I would have done nothing different. Is that reasonable to you? Is that reasonable medicine to you? Is that how you want your doctor to care?
>
> . . . .
>
> Is that what you want? You want a doctor to treat you, or you want a doctor to say, well, you're at 139. You're not at 140. No test for you. Or do you want a doctor to think about you?

¶150 The defendants' counsel objected to these remarks at trial, and Braylon's counsel withdrew the first remark. The circuit court sustained the defendants' objection to the second remark. The circuit court, however, did not strike either statement, opting instead to give a "curative" instruction.

58

¶151 The curative instruction followed counsel's remarking: "How do you want to be with your healthcare?  Do you want to be a participant in your healthcare?"  The curative instruction stated:  "There aren't a lot of rules about what can and can't be argued, but one of them is that a lawyer may not ask a juror to place themselves in the position of the injured person or the doctor for that matter.  Not sure that's what was going on, but if you got that idea, disregard it."

¶152 The defendants argued in their motion after the verdict that these "Golden Rule"-type statements were prejudicial and warranted a new trial.  They argued that arguments involving what a juror would want from his or her doctor are irrelevant and appeal to the jurors' emotions.  They further argued that involving jurors' personal feelings about the standard of care caused the jury to consider a standard of care inconsistent with the reasonable physician standard.  They also argued that these statements violated the circuit court's order in limine.

¶153 The circuit court refused to order a new trial on "Golden Rule" grounds.  The circuit court explained that Braylon's counsel's statements were "not [] classic "golden rule" violations, where the jurors were explicitly asked to place themselves in the position of the plaintiff."  The circuit court noted that its curative instruction obviated any prejudice which may have resulted from Braylon's counsel's remarks.  The circuit court denied the defendants' request for a new trial.

¶154 The circuit court is in the best position to evaluate "Golden Rule" statements and should look at a variety of factors such as "the nature of the case, the emphasis upon the improper measuring stick, the reference in relation to the entire argument, [and] the likely impact or effect upon the jury." Rodriguez v. Slattery, 54 Wis. 2d 165, 170, 194 N.W.2d 817 (1972).

¶155 The court of appeals concluded that the circuit court did not erroneously exercise its discretion for the following reasons:

- These were not pure "Golden Rule" violations because the jurors were not asked to place themselves in the victim's shoes.
- Even if these remarks were "Golden Rule" violations, the circuit court gave the curative instruction stated above.
- The remarks, in light of the entire argument presented to the jury, did not affirmatively prejudice the defendants.[57]

¶156 We agree with the court of appeals' analysis that these remarks did not violate the order in limine.

¶157 In sum, because the circuit court properly considered objections to Braylon's counsel's statements during trial and after the verdict and provided a curative instruction, we

---

[57] Seifert, 364 Wis. 2d 692, ¶46.

conclude that the circuit court did not erroneously exercise its discretion by denying the defendants' motion for a new trial on the basis of these remarks.

(3)

¶158 Turning to their final challenge, the defendants argue that they were prejudiced by Braylon's counsel's remarks (1) disparaging the defendants' attorney and (2) suggesting to the jurors that the jurors were experts.

¶159 The defendants refer to the following remarks:

- I spoke to you in my closing argument and I addressed issues. I didn't tell you what to do. I didn't tell you you're not experts. I didn't tell you you're not that smart. I didn't tell you don't know the law. Apparently I have a little more respect for you than Mr. Leib does.

- I've got a little more faith in you than he does, because he spent the last hour and a half telling you what to do, telling you what you can't do, telling you what you don't know and that you're not going to be experts—you're not going to know the information. I disagree.

- These are the kind of arguments you make to juries if you think they're not too smart. Fool you, scare you, you know? You people are from Lancaster. How smart could you be, right? I think you're pretty smart. I think you get it. I think you see through all this nonsense. I think you should be respected, not told what to do or fooled. You should be talked to like adults, make you own decisions about this case. Not be told what to do.

- This shell game, you know, this game that they're trying to play with you. You know, it's that game, you know, when you go to the fair? Where's the ball? Whoa, whoa, whoa, where's the ball? That's what they tried to do to you. It's a matter of respect. I don't do it to you. I'm

giving you the information, you'll figure it out.
I'm not telling you what to do. You're smart.

- So when Mr. Leib comes before you and makes his
big grandstand move. Where's this one, where's
that one? Where's this one? Well, you know,
it's just not true. It's a matter, again, of
respect. It's a matter of respecting you as a
group and trying to fool you. You're not going
to get fooled. You're pretty damn smart. You're
not going to get fooled. I don't think you'll
get fooled.

- You have common sense and you can analyze the
expert testimony and you're smart enough to do
it. I'm like, again, I'm like Mr. Leib. I have
a lot of faith in your smarts. I think you are
experts in a sense. I think you've learned quite
a bit and I think you can make good decisions. I
don't have to tell you what to do or how to do
it. I'm not going to do that. But think it
through, ladies and gentlemen.

- Unlike Mr. Leib, I think you're smart people and
I think you've learned the medicine and I think
you are experts in a sense.

¶160 The circuit court concluded that, in context, these statements (and others of a similar vein) were not prejudicial or improper. The circuit court explained that these were rebuttal statements made in response to the defendants' "strenuous argument" and were meant to empower the jury to weigh the conflicting expert testimony and make the required credibility determinations.

¶161 The circuit court also explained that in a complex medical malpractice case filled with days of expert medical testimony, jurors have to make a finding based on medical evidence, so they do "in a sense become expert." The circuit court concluded there was nothing wrong with telling jurors that

they are smart while simultaneously characterizing defense counsel's view of the jurors as that they are "dumb."

¶162 Considering the context in which these remarks arose, we conclude that the circuit court did not erroneously exercise its discretion in ruling in favor of Braylon. Braylon's counsel's remarks were used to empower the jury to perform its essential role of weighing conflicting testimony and making credibility determinations.

¶163 The remarks at issue did not cause the jury to reach a decision that it would not have reached otherwise. Accordingly, we affirm the court of appeals' decision that the circuit court did not erroneously exercise its discretion in concluding that Braylon's counsel's remarks during closing argument did not constitute prejudicial error justifying a new trial.

### III

¶164 Lastly, the defendants argue that this court should grant their motion for a new trial in the interests of justice under Wis. Stat. § 751.06.[58] They claim that justice was not

---

[58] Wisconsin Stat. § 751.06 provides:

Discretionary reversal. In an appeal in the supreme court, if it appears from the record that the real controversy has not been fully tried, or that it is probable that justice has for any reason miscarried, the court may reverse the judgment or order appealed from, regardless of whether the proper motion or objection appears in the record, and may direct the entry of the proper judgment or remit the case to the trial court for the entry of the proper judgment or for a new trial, and direct the making of such amendments in the pleadings and the adoption of such

(continued)

63

served because the circuit court admitted Dr. Wener's unreliable testimony and did not order a new trial in response to Braylon's counsel's prejudicial remarks.

¶165 We have already concluded that the circuit court did not erroneously exercise its discretion by admitting Dr. Wener's testimony or by failing to grant a new trial on the basis of Braylon's counsel's remarks. Nevertheless, we will elaborate further on Wis. Stat. § 751.06.

¶166 Under this court's interpretations, Wis. Stat. § 751.06 rarely calls for a new trial. This court has often expressed its "reluctan[ce] to grant a new trial in the interest of justice" and has stated that it "exercises its discretionary power only in exceptional cases." State v. Cuyler, 110 Wis. 2d 133, 141, 327 N.W.2d 662 (1983) (ordering new trial where trial court misread evidentiary statute and thus prohibited material witnesses from testifying). Such "exceptional" cases occur in two situations: (1) "when the real controversy has not been fully tried" and (2) "when it is probable that justice has for any reason been miscarried." Vollmer v. Luety, 156 Wis. 2d 1, 7, 456 N.W.2d 797 (1990).

---

procedure in that court, not inconsistent with statutes or rules, as are necessary to accomplish the ends of justice.

¶167 The real controversy was fully tried in the instant case and there is no "substantial degree of probability that a different result was likely to be produced on retrial.[59]

¶168 For the reasons set forth, we affirm the decision of the court of appeals.

*By the Court.*—The decision of the court of appeals is affirmed.

---

[59] Discretionary reversals based on a miscarriage of justice are appropriate when this court "determine[s] to a substantial degree of probability that a different result was likely to be produced on retrial." State v. Wyss, 124 Wis. 2d 681, 741, 370 N.W.2d 745 (1985).

¶169 ANNETTE KINGSLAND ZIEGLER, J. *(concurring)*. I concur only in the court's conclusion to affirm the decision of the court of appeals. I do not join the lead opinion for two reasons. First, the lead opinion does not sufficiently address the legislature's 2011 changes to Wis. Stat. § 907.02 (2009-10), which had significant effect on the admissibility of expert opinion testimony in Wisconsin. The legislature has now tightened the applicable standard. Second, the lengthy lead opinion does not adequately guide trial courts with regard to how they should apply Wis. Stat. § 907.02 (2013-14).[1] I write to clarify that § 907.02 has now changed the gatekeeping function of the trial court concerning the admissibility of expert testimony. Simply stated, the trial court now must adhere to and apply the heightened Daubert-Wis. Stat. § 907.02 standard. In my view, a best practice for trial courts and counsel is to create a detailed, complete record regarding why any particular expert's testimony meets the heightened scrutiny due under § 907.02. The trial court's determinations here are upheld under the facts of this case because the trial court did not erroneously exercise its discretion in admitting the testimony of Dr. Wener.

¶170 While I agree that this court should uphold the circuit court's decision to admit Dr. Wener's expert testimony at trial, I reach this conclusion in spite of the fact that the legislature tightened the standard of admissibility of expert

---

[1] All subsequent references to the Wisconsin Statutes are to the 2013-14 version unless otherwise indicated.

1

opinion testimony when it amended Wis. Stat. § 907.02 (2009-10). The circuit court did not "appl[y] an improper legal standard or make[] a decision not reasonably supported by the facts of record" in admitting Dr. Wener's testimony, 118th St. Kenosha, LLC v. DOT, 2014 WI 125, ¶18, 359 Wis. 2d 30, 856 N.W.2d 486 (quoting 260 North 12th St., LLC v. DOT, 2011 WI 103, ¶38, 338 Wis. 2d 34, 808 N.W.2d 372), and its decision should be upheld. See id. I view the record below, however, as a "close call" which might not survive appellate review had this been a different case type.

I

¶171 We have recognized that the legislature amended Wis. Stat. § 907.02 (2009-10) in 2011 Wisconsin Act 2 in order "to adopt the Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), reliability standard as stated in Federal Rule of Evidence 702." 260 North 12th St., 338 Wis. 2d 34, ¶55 n.10. Allow me to provide background concerning the federal adoption of Daubert. Unlike in Wisconsin, where the Daubert standard heightened the level of scrutiny to apply to expert witnesses, in the federal system, Daubert loosened the standard for admission of expert testimony.

¶172 To begin with, while the federal rule, Rule 702, may "embod[y] a liberal standard of admissibility for expert opinions," Nimely v. City of New York, 414 F.3d 381, 395 (2d Cir. 2005), it is liberal as compared to the standard it "superseded," namely the so-called Frye "'general acceptance' test," Daubert, 509 U.S. at 585-87 (named for Frye v. United

2

States, 293 F. 1013 (D.C. Cir. 1923)). See Nimely, 414 F.3d at 395-96. It is not liberal as compared to Wisconsin's prior test for admitting expert testimony.

¶173 Frye's "austere standard" "made 'general acceptance' [of the matter upon which expert scientific testimony is based] the exclusive test for admitting expert scientific testimony." Daubert, 509 U.S. at 585-86, 589. Daubert recognized that the Federal Rules of Evidence, on the other hand, did not mandate general acceptance, consistent with the Rules' "general approach of relaxing the traditional barriers to 'opinion' testimony." Id. at 588-89 (quoting Beech Aircraft Corp. v. Rainey, 488 U.S. 153, 169 (1988)).

¶174 In Wisconsin, however, there is no "traditional barrier[]" à la Frye for the legislature's adoption of Rule 702 to "relax[]." See State v. Walstad, 119 Wis. 2d 483, 516, 351 N.W.2d 469 (1984) ("The Frye concept is alien to the Wisconsin law of evidence."). Wisconsin's prior standard of admissibility of expert evidence was considerably more accommodating than either the Frye test or Rule 702's standard. As stated, Frye's yardstick is "general acceptance." Rule 702 mandates, inter alia, that expert testimony be "based on sufficient facts or data" and "the product of reliable principles and methods" and that the expert testifying "reliably appl[y] the principles and methods to the facts of the case." Fed. R. Evid. 702(b)-(d). In contrast, under the previous Wisconsin standard "questions of the weight and reliability of relevant evidence [were] matters for the trier of fact." State v. Fischer, 2010 WI 6, ¶7, 322

3

Wis. 2d 265, 778 N.W.2d 629. "[E]xpert testimony [was] generally admissible in the circuit court's discretion if the witness [was] qualified to testify and the testimony would help the trier of fact understand the evidence or determine a fact at issue." State v. Kandutsch, 2011 WI 78, ¶26, 336 Wis. 2d 478, 799 N.W.2d 865. This was a "low threshold." State v. Shomberg, 2006 WI 9, ¶67, 288 Wis. 2d 1, 709 N.W.2d 310 (Butler, J., dissenting) (citing State v. St. George, 2002 WI 50, ¶39, 252 Wis. 2d 499, 643 N.W.2d 777).

¶175 The fact that the legislature has added three new prerequisites to the admission of expert testimony in Wisconsin means that it now requires more of a showing and further trial court analysis before expert testimony may be introduced. That the legislature now requires——in addition to its earlier mandates of a qualified expert and sufficiently helpful testimony, Kandutsch, 336 Wis. 2d 478, ¶26——testimony "based upon sufficient facts or data," testimony which is "the product of reliable principles and methods" and a witness who has "applied the principles and methods reliably to the facts of the case," Wis. Stat. § 907.02(1), suggests that trial courts must now be much more piercing in their evaluation of proffered expert testimony. The days of relatively easy admission of expert testimony into Wisconsin courtrooms are over. The trial courts' gatekeeping function has changed in light of § 907.02.

¶176 The Wisconsin legislature's adoption of the Daubert standard was part of a larger seemingly legislative reaction to Wisconsin Supreme Court decisions; one observer argues that "Act

4

generated the most significant changes in at least sixteen years to Wisconsin's civil litigation system by limiting the applicability of 'risk contribution' theory, capping punitive damages, and mandating damages for frivolous claims," "most drastically chang[ing] the areas of strict products liability and expert opinion testimony." Kristen Irgens, Comment, Wisconsin Is Open for Business or Business Just As Usual? The Practical Effects and Implications of 2011 Wisconsin Act 2, 2012 Wis. L. Rev. 1245, 1247 (2012) (footnotes omitted); see Honorable Diane S. Sykes, Reflections on the Wisconsin Supreme Court, 89 Marq. L. Rev. 723, 737-38 (2006) (arguing that certain "cases from the last term reflect a court quite willing to aggressively assert itself to implement the statewide public policies it deems to be most desirable," and that "[t]he court is loosening the usual constraints on the use of its power, freeing itself to move the law essentially as a legislature would, except that its decisions are for the most part not susceptible of political correction as the legislature's would be").[2]

¶177 Previously this court has rejected the invitation to follow the Daubert approach taken in the federal courts with

---

[2] Compare, e.g., Thomas ex rel. Gramling v. Mallett, 2005 WI 129, ¶¶178-79, 285 Wis. 2d 236, 701 N.W.2d 523 (Wilcox, J., dissenting) (contending that the court's "expansion" of risk-contribution theory "amounts to an unwarranted and unprecedented relaxation of the traditional rules governing tort liability, and raises serious concerns of fundamental fairness"), with 14 Jay E. Grenig, Wisconsin Practice Series: Elements of an Action § 14:5, at 765 (2015-2016 ed.) (arguing that Act 2 "limits the holding of Thomas").

regard to expert testimony. See Fischer, 322 Wis. 2d 265, ¶7 ("[T]here is no reason for us to revisit [in this case] Wisconsin's well-established role for the circuit court where expert testimony is proffered. The law in Wisconsin continues to be that questions of the weight and reliability of relevant evidence are matters for the trier of fact. . . . We, therefore, decline to adopt a Daubert-like approach to expert testimony that would make the judge the gatekeeper."). Act 2 negates this decision, transforming Wisconsin law so that it now adheres to Federal Rule 702's heightened standard. To minimize the significance of this change, as the lead opinion might be read to do, contravenes the requirement of Wisconsin's Act 2, which clearly contemplates a more substantial burden on litigants who seek to have expert testimony admitted in Wisconsin courts.

¶178 Importantly, even after Daubert, trial courts retain substantial discretion in deciding whether to admit expert testimony. See, e.g., Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141–42 (1999) ("[T]he test of reliability is 'flexible,' and Daubert's list of specific factors[3] neither necessarily nor

---

[3] In Daubert the Supreme Court "discussed certain . . . factors . . . some or all of which might prove helpful in determining the reliability of a particular scientific 'theory or technique.'" Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141 (1999) (quoting Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 593-94 (1993)). The Daubert Court pointed to "whether [a theory or technique] can be (and has been) tested," "whether the theory or technique has been subjected to peer review and publication," "the known or potential rate of error," and whether there is "general acceptance" of the matter within the "relevant scientific community." Daubert, 509 U.S. at 593-94 (quoting United States v. Downing, 753 F.2d 1224, 1238 (3d Cir. 1985)).

exclusively applies to all experts or in every case. Rather, the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination." (quoting Daubert, 509 U.S. at 594)). Moreover, the question before this court in reviewing the circuit court's evidentiary decision below "is not whether this court agrees with the ruling of the trial court, but whether appropriate discretion was in fact exercised." Martindale v. Ripp, 2001 WI 113, ¶29, 246 Wis. 2d 67, 629 N.W.2d 698 (quoting State v. Wollman, 86 Wis. 2d 459, 464, 273 N.W.2d 225 (1979)).

¶179 Given the foregoing, the facts of this current case might stand as a poor example to clearly illustrate the heightened standard of Wis. Stat. § 907.02. This court today decides that the court below did not erroneously exercise its discretion but does little to advise courts how to apply the new heightened standard to other cases involving different expert testimony. I note that, had the circuit court below decided to exclude Dr. Wener's testimony, we would analyze that exclusion of evidence in light of the standard espoused in Daubert and the fact that we owe the circuit court erroneous-exercise-of-discretion deference. In this case, under these facts, involving this doctor's testimony, that deference due tips the scales in favor of the circuit court's detailed determination below.

II

7

¶180 In this medical malpractice case, the defense seeks to exclude the testimony of a medical doctor who is board certified in obstetrics and gynecology, who has delivered thousands of babies over three decades and confronted dozens of instances of shoulder dystocia, who taught medical students and residents in a clinical capacity for four years at the University of California, San Diego, and who served as chairman of the OB/GYN department at a hospital for 20 years, arguing that this expert cannot meet the Daubert standard as set forth in Wis. Stat. § 907.02.  The above expertise is directly on point with the claim made here.

¶181 Wisconsin Stat. § 907.02(1) requires, for the admission of expert testimony: (1) that "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue"; (2) that the expert witness "testify[ing] thereto in the form of an opinion or otherwise" is "qualified as an expert by knowledge, skill, experience, training, or education"; (3) that the expert testimony is "based upon sufficient facts or data"; (4) that the expert testimony is "the product of reliable principles and methods"; and (5) that the expert witness "has applied the principles and methods reliably to the facts of the case." § 907.02(1).

¶182 Digging deeper into the facts specific to this case, Dr. Balink argues that Dr. Wener's testimony is not the product of reliable principles and methods, and that Dr. Wener did not apply the principles and methods he used reliably to the facts

of the case. Dr. Balink contends that Dr. Wener's opinions are simply based on his own personal preferences rather than, for instance, on medical literature; criticizes Dr. Wener's so-called "holistic" approach; and points out supposedly contradictory or confusing aspects of Dr. Wener's testimony. All of these arguments could be well-developed in cross-examination. Argument could be made that such personal preference does not meet the legal definition of medical malpractice. The circuit court did not erroneously exercise its discretion in declining to exclude Dr. Wener's testimony. The trial court concluded that Dr. Wener's opinion was "reliably based on a reliable medical methodology looking at recognized factors of the standard of care."

¶183 Wisconsin Stat. § 907.02 uses, for example, two key terms relevant to this case: "method[]" and "principle[]." See Wis. Stat. § 907.02(1). A "method" is a "mode of organizing, operating, or performing something, esp. to achieve a goal." Method, Black's Law Dictionary 1141 (10th ed. 2014). A "principle" is a "basic rule, law, or doctrine; esp., one of the fundamental tenets of a system." Principle, id. at 1386. Generally speaking, Dr. Wener's method in providing the disputed expert testimony was, to quote the plaintiffs-respondents' brief, to "review the [relevant medical] records and provide an opinion based upon his education, training, and 36 years of experience" as to whether the steps taken and not taken by Dr. Balink in her care of Braylon and Kimberly Seifert met the applicable standard of care. More specifically, Dr. Wener's

9

application of his education, training, and experience to the facts of the Seiferts' case included consideration of a specific set of medical "principles," namely the various "risk factors" for shoulder dystocia present in the Seiferts' case. These principles suggested that "maternal obesity, excessive weight gain [in the mother], gestational diabetes [suspected through the result of blood glucose testing,] . . . a large baby[,]" and use of a vacuum during delivery all increase the likelihood that shoulder dystocia will occur during delivery.

¶184 Moreover, the Wisconsin Jury Instructions state the standard used in a case involving alleged medical negligence like this one in part as follows:

> In (treating) (diagnosing) (plaintiff)'s (injuries) (condition), (doctor) was required to use the degree of care, skill, and judgment which reasonable (doctors who are in general practice) (specialists who practice the specialty which (doctor) practices) would exercise in the same or similar circumstances, having due regard for the state of medical science at the time (plaintiff) was (treated) (diagnosed). A doctor who fails to conform to this standard is negligent. The burden is on (plaintiff) to prove that (doctor) was negligent.

> A doctor is not negligent, however, for failing to use the highest degree of care, skill and judgment or solely because a bad result may have followed (his) (her) (care and treatment) (surgical procedure) (diagnosis). The standard you must apply in determining if (doctor) was negligent is whether (doctor) failed to use the degree of care, skill, and judgment which reasonable (general practitioners) (specialists) would exercise given the state of medical knowledge at the time of the (treatment) (diagnosis) in issue.

Wis JI—Civil 1023 at 1. Dr. Wener's conclusion was essentially that, given the presence of the risk factors discussed as

10

evidenced by the facts of the case and the medical records he studied, certain of Dr. Balink's actions and omissions——failure to perform additional glucose testing, for example——constituted unreasonable care because of the unjustified risk of shoulder dystocia. Clearly, cross-examination and argument could dispel the notion that Dr. Wener's conclusions are but one, and not a conclusive, reasonable standard of care.

¶185 The circuit court below indeed assessed the reliability of Dr. Wener's testimony as required by Wis. Stat. § 907.02(1). The circuit court explained, citing McGovern ex rel. McGovern v. Brigham & Women's Hosp., 584 F. Supp. 2d 418 (D. Mass. 2008), that obstetrics "is a recognized field of expertise" as opposed to "junk science." See McGovern, 584 F. Supp. 2d at 424. The circuit court characterized Dr. Wener's method as "holistic" "clinical medical methodology," relying partly on Cooper v. Carl A. Nelson & Co., 211 F.3d 1008 (7th Cir. 2000), in which the Seventh Circuit——applying Daubert—— noted the apparent agreement of the party seeking to exclude the expert testimony of three physicians that "in clinical medicine, the methodology of physical examination and self-reported medical history employed by [one of the experts] is generally appropriate." Cooper, 211 F.3d at 1020; see also, e.g., Reference Manual on Sci. Evid. 703 (3d ed.) ("A patient-physician encounter typically consists of four components: (1) patient history, (2) physical examination, (3) medical decisionmaking, and (4) counseling."). This approach was analogous to the one taken by Dr. Wener (although Dr. Wener's

11

review was also retroactive). The circuit court observed that Dr. Wener's opinion was "based upon the facts of this case," and on "recognized factors subject to cross[-]examination" such as Braylon's estimated size, Kimberly's weight gain, and the results of Kimberly's glucose tests. Consequently, the court concluded that Dr. Wener's opinion was "reliably based on a reliable medical methodology looking at recognized factors of the standard of care."

¶186 The court tempered its conclusions by exploring various weaknesses in Dr. Wener's approach, stating, for instance, "[A] lot of things in medicine can't be tested because you can't repeat the exact same factors because every human body is different. And maybe that makes the defense's case ultimately." The court also acknowledged that there was some level of extrapolation in Dr. Wener's analysis. But there was a common thread running through the court's remarks: that although Dr. Wener's testimony was not perfect, it was "sufficiently reliable to be admitted."

¶187 Remaining in our required position in review of the record makes plain that the circuit court "applie[d] [the] []proper legal standard [and] ma[de] a decision . . . reasonably supported by the facts of record." 118th St. Kenosha,, 359 Wis. 2d 30, ¶18 (quoting 260 North 12th St., 338 Wis. 2d 34, ¶38). Dr. Wener's conclusions certainly could have been better supported. In particular, he could have done a better job of attempting to quantify the point at which a tolerable level of risk of shoulder dystocia becomes intolerable. In addition,

12

Dr. Balink points to alleged errors and inconsistencies in Dr. Wener's testimony. But all of these deficiencies were able to be tested on cross-examination; they did not mandate exclusion of the entire expert opinion. The record substantiates a conclusion that Dr. Wener "adhere[d] to the same standards of intellectual rigor that are demanded in [his] professional work." Cooper, 211 F.3d at 1020 (quoting Rosen v. Ciba-Geigy Corp., 78 F.3d 316, 318 (7th Cir. 1996)).[4]

¶188 Ultimately, and as suggested by the circuit court, this case does not involve "junk science," a "junk scientist,"

---

[4] In an amicus brief, the American Medical Association and the Wisconsin Medical Society set forth their concern that:

> If left uncorrected, the decisions of the lower courts would place an unreasonable burden on physicians, [because] . . . [i]n making decisions about how to treat their patients, . . . physicians . . . would have to account for the possibility that the preferences of a physician they have never met . . . could serve as the basis by which their conduct will be judged.

But this argument ignores the fact that the standard against which a physician's conduct is judged is the conduct of a similarly-situated reasonable physician. Wis JI——Civil 1023 at 1. And arguably "for any set of clinical facts, however unique, there are decisions or actions that virtually no doctor would find acceptable." Mark A. Hall, Mary Anne Bobinski & David Orentlicher Health Care Law and Ethics 321 (8th ed. 2013) (presenting idea without necessarily endorsing it). Physicians need only ensure that their conduct matches the conduct of a similarly-situated reasonable physician. Assuming that a judge finds that expert testimony passes the requirements of Wis. Stat. § 907.02, the party against whom the testimony is offered may dispute it by cross-examination and by presenting contrary expert testimony suggesting that the party's conduct was reasonable. It is then up to the jury to decide which set of testimony is more believable.

or a "junk opinion." McGovern, 584 F. Supp. 2d at 424. This was testimony in a "recognized field of expertise" as to the standard of care required, provided by a well-qualified physician who had delivered thousands of babies. Dr. Wener used his own education, training, and experience to review the relevant medical records and to reach a conclusion as to whether the applicable standard of care was followed. The circuit court did not err in admitting this testimony.[5]

### III

¶189 Thus, I concur only in the court's conclusion to affirm the decision of the court of appeals. I do not join the lead opinion for two reasons. First, the lead opinion does not sufficiently address the legislature's 2011 changes to Wis. Stat. § 907.02 (2009-10), which had significant effect on the admissibility of expert opinion testimony in Wisconsin. The

---

[5] I reject Dr. Balink's remaining arguments for reversal. Without opining on whether, or the extent to which, the Seiferts' attorney violated various pretrial orders, and without opining on the possibility that Dr. Balink has waived this argument, I conclude that the record does not establish that, because of comments made by the Seiferts' attorney during closing arguments following this week-long jury trial, "the verdict reflects a result which in all probability would have been more favorable to the complaining party but for the improper argument." Wagner v. Am. Family Mut. Ins. Co., 65 Wis. 2d 243, 250, 222 N.W.2d 652 (1974) (citing Klein v. State Farm Mut. Auto. Ins. Co., 19 Wis. 2d 507, 510 n.1, 120 N.W.2d 885 (1963)). The circuit court did not erroneously exercise its discretion in declining to grant a new trial. See id. at 249-50.

Further, given the conclusions set forth in this writing, discretionary reversal is not warranted. See Wis. Stat. § 751.06.

legislature has now tightened the applicable standard. Second, the lengthy lead opinion does not adequately guide trial courts with regard to how they should apply Wis. Stat. § 907.02. I write to clarify that § 907.02 has now changed the gatekeeping function of the trial court concerning the admissibility of expert testimony. Simply stated, the trial court now must adhere to and apply the heightened Daubert-Wis. Stat. § 907.02 standard. In my view, a best practice for trial courts and counsel is to create a detailed, complete record regarding why any particular expert's testimony meets the heightened scrutiny due under § 907.02. The trial court's determinations here are upheld under the facts of this case because the trial court did not erroneously exercise its discretion in admitting the testimony of Dr. Wener.

¶190 While I agree that this court should uphold the circuit court's decision to admit Dr. Wener's expert testimony at trial, I reach this conclusion in spite of the fact that the legislature tightened the standard of admissibility of expert opinion testimony when it amended Wis. Stat. § 907.02 (2009-10). The circuit court did not "appl[y] an improper legal standard or make[] a decision not reasonably supported by the facts of record" in admitting Dr. Wener's testimony, 118th St. Kenosha, 359 Wis. 2d 30, ¶18 (quoting 260 North 12th St., 338 Wis. 2d 34, ¶38), and its decision should be upheld. See id. I view the record below, however, as a "close call" which might not survive appellate review had this been a different case type.

15

¶191 For the foregoing reasons, I respectfully concur.

¶192 MICHAEL J. GABLEMAN, J. *(concurring in the judgment).* This is a review of a published decision of the court of appeals that affirmed the Grant County circuit court's[1] order denying Dr. Kay M. Balink's ("Dr. Balink") postverdict motion for a new trial. Seifert ex rel. Scoptur v. Balink, 2015 WI App 59, 364 Wis. 2d 692, 869 N.W.2d 493. Dr. Balink requested a new trial because (1) the circuit court erred by admitting the medical standard-of-care expert testimony of Dr. Jeffrey Wener ("Dr. Wener"); (2) counsel's statements during closing arguments unfairly prejudiced the verdict; and (3) the interests of justice require a new trial because the issues have not been fully tried.

¶193 This case requires us to interpret how the Daubert[2] standard as adopted in Wis. Stat. § 907.02(1) (2013-14)[3] applies to a standard-of-care expert in a medical malpractice case where the expert relies on his experience to show that his principles and methods, and the application thereof, are reliable.

¶194 I conclude that experience is sufficient to satisfy Daubert's reliability requirement provided the expert shows how his experience makes his opinion reliable. No medical literature is required provided this is done. Thus, Dr. Wener's opinion is admissible in this case because he showed how his

---

[1] The Honorable Craig R. Day presided.

[2] Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993).

[3] All subsequent references to the Wisconsin Statutes are to the 2013-14 version unless otherwise indicated.

experience made his opinion reliable, and the circuit court did not err when it admitted his testimony at trial. Consequently, the circuit court did not err when it denied Dr. Balink's motion for a new trial based on her argument that the circuit court erroneously admitted Dr. Wener's testimony.

¶195 Further, I conclude the circuit court did not err when it denied Dr. Balink's request for a new trial based on the effect of counsel's statements during closing argument.

¶196 I do not reach Dr. Balink's request for a new trial in the interests of justice as Dr. Balink bases the request on the inadmissibility of Dr. Wener's testimony and the effect of counsel's statements during closing arguments. I consider it unnecessary to reach her request because I conclude that the circuit court properly admitted Dr. Wener's testimony and the verdict was not unfairly prejudiced by counsel's statements.

¶197 Accordingly, I would affirm the decision of the court of appeals, and I concur in the court's judgment. I write separately, however, to express how I reach this result.

I.  FACTUAL BACKGROUND AND PROCEDURAL HISTORY

A.  Ms. Seifert's Prenatal Care

¶198 Beginning on December 5, 2008, Dr. Balink assumed Ms. Seifert's prenatal care. As part of this prenatal care, Dr. Balink tracked Ms. Seifert's weight. Ms. Seifert weighed 269 pounds at the beginning of the pregnancy, which meant Ms. Seifert was obese. Over the course of her pregnancy, Ms. Seifert gained an additional 36 pounds, and by the time of delivery, she weighed 305 pounds.

2

¶199 Dr. Balink took regular fundal measurements in order to measure the baby's growth and to estimate its size. On occasion, Dr. Balink used ultrasounds, but typically, Dr. Balink used fundal measurements. When performing these fundal measurements, Dr. Balink placed a tape measure on Ms. Seifert's stomach and measured the distance from her pubic bone to the top of the fundus, the fundus being the top of her uterus.

¶200 As another aspect of Ms. Seifert's prenatal care, Dr. Balink monitored Ms. Seifert's glucose level. Here Dr. Balink used a one-hour glucose tolerance test in order to determine if Ms. Seifert's glucose level rose above a 140 mg/dL threshold. If Ms. Seifert's glucose level rose above the 140 mg/dL threshold, Dr. Balink would have performed a three-hour glucose tolerance test to determine if Ms. Seifert had gestational diabetes. Because Ms. Seifert's glucose level was 131 mg/dL, Dr. Balink considered Ms. Seifert's glucose level safe and never ran the diagnostic test to determine if in fact Ms. Seifert had gestational diabetes.

### B. Braylon Seifert's Delivery

¶201 On May 26, 2009, Dr. Balink ordered Ms. Seifert's labor be induced. In the induction order, Dr. Balink noted that Ms. Seifert's baby was "expected LGA," meaning large for gestational age. Again using a fundal height measurement, Dr. Balink estimated the baby's weight at eight pounds, eight ounces. Dr. Balink did not order an ultrasound, a more accurate method of measuring the baby's size, despite her awareness of

the complicating factors of Ms. Seifert's obesity and the possibility of the LGA child.

¶202 Ms. Seifert arrived at the hospital for induction of labor on May 28, 2009. After she had been pushing for one hour without making progress in delivering her baby, Ms. Seifert tired, and Dr. Balink decided to use a vacuum device on the baby's head for assistance. Braylon Seifert's ("Braylon") head emerged when Dr. Balink used the vacuum, but shortly thereafter, it retracted. This type of retraction, known as the "turtle sign," indicates shoulder dystocia, which essentially means the baby's shoulder is caught on the mother's pubic bone. Thus, after seeing Braylon's head retract, Dr. Balink quickly diagnosed Braylon with shoulder dystocia.

¶203 Shoulder dystocia can be a life-threatening emergency if not swiftly resolved. This is so because a baby experiencing such a condition cannot breathe properly. In an effort to resolve the situation as quickly as possible, Dr. Balink attempted a variety of maneuvers to safely deliver Braylon. Eventually she succeeded by using traction to dislodge Braylon's shoulder and pull him out. At 12:24 a.m. on May 29, 2009, Braylon was born. He weighed nine pounds, twelve ounces. Only a few minutes had elapsed from the time Dr. Balink diagnosed the shoulder dystocia to the time she delivered Braylon, and it appeared that the situation had been successfully resolved with no permanent harm to the baby. However, Braylon was diagnosed just days later with a permanent brachial plexus injury in his left arm that inhibits its growth and use. Braylon has since

4

undergone surgery to improve the use of his left arm, but even with surgery and therapy, he will never have full use of his arm.

### C. Dr. Balink's Trial for Medical Malpractice

¶204 After discovering Braylon's permanent brachial plexus injury, Braylon's parents (David and Kimberly) and his guardian ad litem (Paul J. Scoptur) sued Dr. Balink and Proassurance Wisconsin Insurance Co. on Braylon's behalf alleging that Dr. Balink was (1) negligent in providing Ms. Seifert's prenatal care; (2) negligent in delivering Braylon; and (3) failed to obtain Ms. Seifert's informed consent before using the vacuum to assist with the delivery.

### 1. Dr. Wener's Opinion on the Standard of Care

¶205 Braylon's parents and guardian ad litem hired Dr. Wener, a board certified obstetrician-gynecologist, to testify as to the standard of care required of Dr. Balink as a family practitioner and Dr. Balink's breach of that standard of care. According to Dr. Wener, Dr. Balink fell below the standard of care because (1) she did not use an ultrasound to estimate Braylon's weight prior to delivery despite Ms. Seifert's obesity and Braylon's suspected LGA status; (2) she never ordered the three-hour glucose tolerance test to determine if Ms. Seifert did in fact have gestational diabetes even though Ms. Seifert was obese and had gained more weight than would be expected over the course of her pregnancy; and (3) she used a vacuum to assist

5

in the delivery in spite of the presence of an increased risk for shoulder dystocia.[4]

¶206 To form both his opinion of the applicable standard of care as well as his opinion that Dr. Balink had breached that standard of care, Dr. Wener considered the following factors: (1) Ms. Seifert's prepregnancy weight of 269 pounds; (2) Ms. Seifert's 36-pound weight gain over the course of her pregnancy; (3) the 131 mg/dL result from the 1-hour glucose tolerance test; and (4) Braylon's estimated fetal weight of 8 pounds, 8 ounces. Dr. Wener opined that, as a result of the confluence of these factors, Braylon was at an increased risk for shoulder dystocia. Furthermore, Dr. Wener testified that Dr. Balink fell below the applicable standard of care because her conduct did not account for the increased risk created by the factors presented by Ms. Seifert and her unborn child.

¶207 Dr. Wener testified that a family practitioner practicing obstetrics in accordance with the applicable standard of care in 2009 would have recognized that Ms. Seifert's obesity and above-average weight gain would have rendered a fundal measurement too inaccurate for the situation and would have instead ordered an ultrasound in order to estimate the baby's size. Obtaining a more accurate measurement would, in turn, have indicated to Dr. Balink that the vacuum device should not

---

[4] Dr. Wener also opined that Dr. Balink fell below the standard of care by applying excessive traction when resolving the shoulder dystocia, but this part of Dr. Wener's opinion is unchallenged.

be used on a baby of Braylon's size because of the risk of shoulder dystocia. In addition, Dr. Wener opined that a family practitioner practicing obstetrics in 2009 should have used a lower threshold than Dr. Balink used——130 mg/dL as opposed to 140 mg/dL——when performing the 1-hour glucose tolerance test because of Ms. Seifert's weight, which increased the risk of gestational diabetes. Finally, Dr. Wener opined that, to meet the applicable standard of care, a family practitioner practicing obstetrics in 2009 would avoid use of a vacuum device during the delivery because of the increased risk of shoulder dystocia resulting from Ms. Seifert's weight and Braylon's suspected status as a large baby.

### 2. Dr. Balink's Challenge to Dr. Wener's Opinion on the Standard of Care

¶208 Before trial, Dr. Balink challenged the admissibility of Dr. Wener's opinion, arguing that his opinion was unreliable because it was based not on science and medical literature but rather was based solely on Dr. Wener's personal preferences. At a pretrial hearing to address, inter alia, the admissibility of Dr. Wener's opinion, the circuit court determined Dr. Wener used a "holistic" method whereby Dr. Wener looked at the patient as a whole using recognized factors in order to come to a conclusion about the standard of care required. In support of its decision to admit Dr. Wener's opinion, the circuit court pointed to "the vagaries of medical treatment and diagnosis" and emphasized that Dr. Wener does not represent the junk science Daubert was intended to exclude. Thus, the circuit court ruled that Dr.

7

Wener's opinion testimony was admissible, and the case proceeded to trial.

### 3. Closing Arguments

¶209 At trial, Kenneth M. Levine ("Atty. Levine"), the Seiferts' counsel, made a series of statements during closing arguments that Dr. Balink argues require a new trial because the statements were improper and unfairly prejudiced the verdict. First, Dr. Balink says Atty. Levine compared Dr. Wener's opinion about the standard of care required of Dr. Balink as a family practitioner to the standard of care required of an ordinary person while driving. Dr. Balink's counsel objected to these statements as a violation of the "rules of the road prohibition" put in place by the circuit court in a ruling on a motion in limine. The circuit court's ruling stated that Atty. Levine could not compare medical negligence to ordinary negligence. Second, Atty. Levine asked the jurors on three occasions how they would like their doctors to care for them, and in so doing, Dr. Balink argues Atty. Levine violated the "golden rule prohibition." At the time of the first violation, Atty. Levine withdrew his statement in response to the objection made by Dr. Balink's counsel; at the time of the second violation, the circuit court gave a brief curative instruction; and at the time of the third violation, the circuit court sustained the objection made by Dr. Balink's counsel. Third, in his rebuttal argument, Atty. Levine made a statement that he thought more highly of the jurors than Dr. Balink's counsel and another

statement that he thought the jurors were well equipped to decide the case and were experts in their own right.

#### 4. Dr. Balink's Motion for a New Trial

¶210 Following the verdict, Dr. Balink moved the circuit court for a new trial based on three arguments. First, Dr. Balink argued the circuit court erred when it admitted Dr. Wener's testimony. Second, the cumulative effects of Atty. Levine's statements during closing arguments unfairly prejudiced the verdict. Third, the interests of justice required a new trial because the issues were not fully tried due to the erroneous admission of Dr. Wener's testimony and the effect of Atty. Levine's improper statements during closing arguments.

¶211 At the hearing to address Dr. Balink's motion for a new trial, the circuit court again determined that Dr. Wener's opinion was admissible.[5] The circuit court noted Dr. Wener's method was grounded in science and further that his method can be tested. In regard to the nature of Dr. Wener's testimony, the circuit court observed, "[I]t is not in the nature of engineering or other more hard sciences. It is not a mathematical calculation wherein one plus one plus one always yields three. Sometimes it yields 3.2 and sometimes it yields 2.8." Further, in light of the expert testimony Dr. Balink introduced at trial, it was more firmly assured of the

---

[5] In total, the circuit court considered the admissibility of Dr. Wener's testimony three times: first at the pretrial hearing, second at trial pursuant to an objection to Dr. Wener's testimony, and third at the hearing on Dr. Balink's motion for a new trial.

admissibility of Dr. Wener's testimony because there were points on which Dr. Balink's experts agreed with Dr. Wener.

¶212 The circuit court also found that neither Atty. Levine's statements, nor their cumulative effect, required an order for a new trial. The circuit court determined that the first set of statements did not violate the motion in limine, even though it was close. In reaching its conclusion, the circuit court noted that the jury was instructed on medical negligence, not ordinary negligence; therefore, the jury was unlikely to see the comparison between the two types of negligence given that the jury had not been instructed on ordinary negligence. For the second set of statements, the circuit court found that the sustained objection of Dr. Balink's counsel and curative instruction given by the court were sufficient to eliminate any unfair prejudice. Finally, for the third set of statements, the circuit court found the context——rebuttal argument——important because Atty. Levine's statements were made in response to statements made by Dr. Balink's counsel during closing arguments. In addition, the circuit court determined that Atty. Levine employed an argument technique meant to empower the jury and give it confidence to decide the case. Therefore, these statements were not improper. Thus, the effect of Atty. Levine's statements did not require a new trial.

¶213 The circuit court then denied Dr. Balink's request for a new trial.

### 5. Dr. Balink's Appeal

10

¶214 Dr. Balink appealed, and the court of appeals affirmed the circuit court determining that it did not err when it denied Dr. Balink's request for a new trial. Seifert, 364 Wis. 2d 692, ¶3. Relying heavily on the discretion afforded to circuit courts in the Daubert analysis, the court of appeals determined the circuit court properly exercised its discretion in admitting Dr. Wener's opinion. Id., ¶¶23-27, 34. Then, pointing out that Dr. Balink failed to move for a mistrial before the verdict, the court of appeals determined that the circuit court did not err when it denied Dr. Balink's request for a new trial based on the effect of Atty. Levine's statements during closing arguments. Id., ¶¶36 n.10, 37. The court of appeals next addressed Dr. Balink's request for a new trial in the interests of justice stating that the issues were fully tried and no new trial was needed. Id., ¶49 n.12.

¶215 Dr. Balink then petitioned this court for review, and because we have yet to address the adoption of the Daubert standard in Wisconsin, we granted review to take the opportunity to define the reliability analysis for a standard-of-care expert in a medical malpractice case.

## II. STANDARD OF REVIEW

¶216 Before discussing the standard of review it is important to note that while Daubert has imposed change in some areas of the law concerning expert testimony, it has not changed the standard of review in such cases. Gen. Elec. Co. v. Joiner, 522 U.S. 136, 141-43 (1997). Thus, review of a circuit court's decision to admit or exclude expert testimony follows the same

11

standards previously used before the legislature adopted the Daubert standard in 2011.

¶217 This court reviews a circuit court's decision to admit or exclude expert testimony for an erroneous exercise of discretion. State v. Kandutsch, 2011 WI 78, ¶23, 336 Wis. 2d 478, 799 N.W.2d 865. "The circuit court has 'broad discretion to admit or exclude evidence,'" and this court upholds the circuit court's decision unless it failed to apply the proper legal standard or the record lacks reasonable support for its decision. Id. (quoting State v. Nelis, 2007 WI 58, ¶26, 300 Wis. 2d 415, 733 N.W.2d 619; Martindale v. Ripp, 2001 WI 113, ¶28, 246 Wis. 2d 67, 629 N.W.2d 698).

¶218 In order to determine whether the circuit court erroneously exercised its discretion, this court must first interpret the Daubert standard as adopted by the legislature in Wis. Stat. § 907.02(1) and determine if the circuit court used the proper legal standard when it analyzed Dr. Wener's testimony. Statutory interpretation is a question of law this court reviews de novo. State v. Hemp, 2014 WI 129, ¶12, 359 Wis. 2d 320, 856 N.W.2d 811. Should this court interpret § 907.02(1) and conclude that the circuit court used the proper legal standard, "the [circuit] court's choice of relevant factors within [the Daubert] framework and its ultimate conclusion as to admissibility" is reviewed for an erroneous exercise of discretion. Lees v. Carthage Coll., 714 F.3d 516, 520 (7th Cir. 2013).

12

¶219 As with evidentiary rulings, this court reviews a circuit court's ruling on a motion for a new trial for an erroneous exercise of discretion. Wagner v. Am. Family Mut. Ins., 65 Wis. 2d 243, 249-50, 222 N.W.2d 652 (1974).

### III. DISCUSSION

¶220 First, I consider the admissibility of Dr. Wener's opinion and conclude that the circuit court properly exercised its discretion when it admitted Dr. Wener's opinion. In so concluding, I further conclude the circuit court properly exercised its discretion in denying Dr. Balink's request for a new trial. Second, I consider the effect of Atty. Levine's statements during closing arguments and conclude the circuit court properly exercised its discretion when it found the effect of the statements did not require a new trial. As noted above, I do not reach Dr. Balink's argument for a new trial in the interests of justice because the circuit court properly admitted Dr. Wener's testimony and Atty. Levine's statements do not require a new trial. Thus, the issues were fully tried, and there is no reason to grant a new trial in the interests of justice under Wis. Stat. § 751.06.

### A. The Admissibility of Dr. Wener's Testimony

### 1. The Governing Statute

¶221 The admissibility of expert testimony is governed by Wis. Stat. § 907.02(1):

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify

13

thereto in the form of an opinion or otherwise, <u>if the testimony is based upon sufficient facts or data, the testimony is the product of reliable principles and methods, and the witness has applied the principles and methods reliably to the facts of the case</u>.

(Emphasis added). This last part of the statute, emphasized above, was added by the legislature in 2011, <u>see</u> 2011 Wis. Act 2, § 34m, and it is this addition that I address today.

¶222 In addressing the addition to § 907.02(1), I first look at the standard previously followed in Wisconsin and then look to federal law for guidance on how Federal Rule 702 ("Rule 702") and <u>Daubert</u> have been interpreted and applied in the federal courts. Next, I evaluate Dr. Wener's testimony and the circuit court's analysis of his testimony in order to determine whether the circuit court erred in determining that Dr. Wener's principles and methods meet the reliability standards set forth. After concluding that Dr. Wener's principles and methods are reliable, I then evaluate if his principles and methods were reliably applied.

2. The Relevancy Standard and Wisconsin's Adoption of the

<u>Daubert</u> Standard

¶223 Traditionally, Wisconsin followed the relevancy standard as articulated in <u>State v. Walstad</u>, 119 Wis. 2d 483, 515-16, 351 N.W.2d 469 (1984), to determine the admissibility of expert testimony. Under this standard, the expert needed only to be qualified, helpful, and relevant in order to be permitted to testify. <u>Id.</u> at 516. Reliability was considered a credibility determination left for the jury. <u>State v. Fischer</u>, 2010 WI 6, ¶2, 322 Wis. 2d 265, 778 N.W.2d 629. When confronted

14

with the opportunity to replace the relevancy standard with the Daubert standard followed in federal courts, this court confirmed adherence to the relevancy standard. E.g., Fischer, 322 Wis. 2d 265, ¶7. Not until the legislature amended the statute governing expert testimony in 2011 to add the language emphasized above did Wisconsin adopt the Daubert standard followed in federal courts. See 2011 Wis. Act 2, § 34m. Thus, because our statute governing the admissibility of expert testimony now mirrors Rule 702, compare Wis. Stat. § 907.02(1), with Fed. R. Evid. 702, we may look to federal law interpreting the Daubert standard for guidance concerning how we should apply the standard in Wisconsin, State v. Gudenschwager, 191 Wis. 2d 431, 439, 529 N.W.2d 225 (1995).

3. Federal Rule of Evidence 702 and the Daubert Standard

¶224 Rule 702 contains five inquiries for a district court to make before admitting expert testimony. Fed. R. Evid. 702. All of these inquiries must be met by a preponderance of the evidence. Id. advisory committee notes (2000 amend.). First, the witness must be qualified. Lees, 714 F.3d at 521. Essentially this means that the witness must possess specialized knowledge, which is something Wisconsin has required for expert testimony before the legislature amended Wis. Stat. § 907.02(1). Second, the witness's testimony must be helpful, meaning it must assist the trier of fact. Lees, 714 F.3d at 521. This element closely relates to the relevance requirement previously followed in Wisconsin. Third, the witness's testimony must be based on sufficient facts and data. Id. Fourth, the witness must have

15

reliable principles and methods, and fifth, those principles and methods must be reliably applied to the facts of the case. Id. at 521-22. I address the fourth and fifth elements today because these elements are new to Wisconsin law with the legislature's adoption of the Daubert standard and are the elements at issue in this case.

### 4. The Reliability Analysis

¶225 In order to assist with the reliability analysis required by the fourth and fifth elements (reliable principles and methods reliably applied to the facts of the case), the United States Supreme Court in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 593-94 (1993), articulated four non-exhaustive factors courts could use to analyze the reliability of expert testimony: (1) whether the method has been or will be tested; (2) whether the method "has been subjected to peer review and publication"; (3) "the known or potential rate of error"; and (4) whether the method has been generally accepted. In articulating these factors, the Court emphasized the factors are flexible and do not represent all the factors a court could possibly consider. Id. at 594. In fact,

> a trial court may consider one or more of the more specific factors that Daubert mentioned when doing so will help determine that testimony's reliability. But, as the Court stated in Daubert, the test of reliability is "flexible," and Daubert's list of specific factors neither necessarily nor exclusively applies to all experts or in every case. Rather, the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination.

16

Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141-42 (1999). "[T]here are many different kinds of experts and many different kinds of expertise, including experts in drug terminology, handwriting analysis, land valuation, agricultural practices, railroad procedures, and so forth." United States v. Brumley, 217 F.3d 905, 911 (7th Cir. 2000). Therefore, the reliability analysis must be flexible enough to allow the circuit court to assess the type of expert being evaluated.

¶226 As a result of the different kinds of experts, courts developed additional factors——many of which are listed in the Advisory Committee Notes of Rule 702——for analyzing the reliability of an expert's opinion as the situation required. In some of these situations, particularly those involving specialized knowledge, courts used an expert's experience to determine reliability. See Kumho Tire, 526 U.S. at 150. Rule 702 expressly allows for the use of an expert's experience, and the Advisory Committee Notes say:

> Nothing in this amendment is intended to suggest that experience alone——or experience in conjunction with other knowledge, skill, training or education——may not provide a sufficient foundation for expert testimony. To the contrary, the text of Rule 702 expressly contemplates that an expert may be qualified on the basis of experience.

Fed. R. Evid. 702 advisory committee notes (2000 amend.) (emphasis added). In fact, "[i]n certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony." Id. Therefore, when assessing reliability, a circuit court should have flexibility to use different reliability factors, including the expert's experience, to

17

analyze whether the expert's opinion is reliable. As the Court pointed out in Kumho Tire,

> [e]xperts of all kinds tie observations to conclusions through the use of what Judge Learned Hand called "general truths derived from . . . specialized experience." And whether the specific expert testimony focuses upon specialized observations, the specialized translation of those observations into theory, a specialized theory itself, or the application of such a theory in a particular case, the expert's testimony often will rest "upon an experience confessedly foreign in kind to [the jury's] own."

526 U.S. at 148-49 (alteration in original) (emphasis added) (citation omitted) (quoting Learned Hand, Historical and Practical Considerations Regarding Expert Testimony, 15 Harv. L. Rev. 40, 54 (1901)).

¶227 In general, when assessing reliability, a circuit court is looking for "good grounds" for the expert's opinion to show that it is "more than subjective belief or unsupported speculation" and demonstrates "a reliable basis in the knowledge and experience of his discipline." Daubert, 509 U.S. at 590, 592. Therefore, whatever factors a court uses to assess an expert's reliability, the factors, and the court's analysis, must ensure the expert has good grounds for his or her opinion. In addition, "[t]he focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." Id. at 595. Thus, if a circuit court finds that an expert has good grounds for his opinion, it is for the jury to decide between competing conclusions.

5. The Reliability Analysis in the Medical Standard-of-Care
Context

18

¶228 When assessing a medical standard-of-care expert, other jurisdictions have found good grounds for the expert's opinion when the expert had experience that demonstrated familiarity with the type of medicine at issue and the standard of care for that type of medicine. For example, the Third Circuit concluded a doctor's testimony was based on good grounds and the district court abused its discretion in excluding the doctor's standard-of-care testimony because the doctor no longer practiced as an interventional cardiologist and now practiced as an invasive cardiologist. Schneider ex rel. Estate of Schneider v. Fried, 320 F.3d 396, 399-400 (3d Cir. 2003). As an invasive cardiologist, the doctor still interacted with, and even advised, interventional cardiologists, which, along with his past experience as an invasive cardiologist, was sufficient to satisfy Daubert. Id. at 406-07. Therefore, the Third Circuit concluded the expert was sufficiently familiar with the type of medicine involved in the case such that he could reliably testify to the standard of care.

¶229 The Sixth Circuit reached a similar conclusion in Dickenson v. Cardiac & Thoracic Surgery of Eastern Tennessee, P.C., 388 F.3d 976, 978-82 (6th Cir. 2004), when it concluded the district court abused its discretion in excluding a cardio-thoracic surgeon's testimony regarding the standard of care required for a pulmonologist. There, the court concluded the district court abused its discretion by not allowing the doctor to testify as to the standard of care based on the doctor's

19

extensive experience and familiarity with the pulmonology issue involved in the case. Id. at 980-82.

¶230 As Hippocrates, the father of medicine, noted in his writing On the Art of Medicine, clinical medicine is an art that requires good judgment developed over time and through experience. Put another way, "medicine is scientific, but not entirely a science." Primiano v. Cook, 598 F.3d 558, 565 (9th Cir. 2010). As the Sixth Circuit noted,

> Daubert's role of "ensur[ing] that the courtroom door remains closed to junk science," is not served by excluding testimony such as [the doctor's] that is supported by extensive relevant experience. Such exclusion is rarely justified in cases involving medical experts as opposed to supposed experts in the area of product liability.

Dickenson, 388 F.3d at 982 (alteration in original) (citation omitted) (quoting Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 267 (2d Cir. 2002)).

6. Determining the Reliability of Dr. Wener's Principles and Methods

¶231 With the foregoing in mind, we now turn to the question of whether Dr. Wener's principles and methods are reliable such that he can testify about the standard of care applicable to Dr. Balink.

i. Identifying Dr. Wener's Principles and Methods

¶232 In order to answer the question before us, namely whether Dr. Wener's testimony is admissible under Daubert, the first step is to identify the principles and methods Dr. Wener employed. The circuit court found Dr. Wener used a "holistic," or comprehensive, method of determining the standard of care

20

applicable to Ms. Seifert. Essentially, this comprehensive method amounts to an expert physician examining the patient as a whole, determining what, if any, of the risk factors recognized by the medical community are present within the patient, and then using that expert physician's experience to interpret the risk factors and arrive at the standard of care required. It is, as it must be, a case-by-case method to determine what type of care is appropriate for a particular patient.

¶233 Here, Dr. Wener identified the following risk factors recognized by the medical community: (1) Ms. Seifert's prepregnancy weight of 269 pounds; (2) Ms. Seifert's 36-pound weight gain over the course of her pregnancy; (3) the 131 mg/dL result from the one-hour glucose tolerance test; and (4) Braylon's estimated fetal weight. As his method, Dr. Wener used his experience to determine that these factors indicated that Ms. Seifert's baby was at an increased risk for shoulder dystocia and that Dr. Balink fell below the standard of care because she did not account for this increased risk.

## ii. Assessing Reliability

¶234 Now that we have identified Dr. Wener's principles and methods, we must determine if they are reliable and reliably applied. In this case, I conclude that the circuit court did not err when it found Dr. Wener's principles and methods are sufficiently reliable and reliably applied. Dr. Wener showed how his experience made his methodology reliable and demonstrated, through his experience, an understanding of the applicable standard of care in a way that he can reliably opine

about the standard of care required. Dr. Wener testified that he delivered 7,500 to 8,000 babies, encountered shoulder dystocia, and even brachial plexus injuries, which shows that Dr. Wener is experienced with the type of medical practice at issue in this case. This experience in turn makes his comprehensive methodology reliable because Dr. Wener has used his factors and his methods in treating his own patients. Dr. Wener also testified that he has experience as Chairman of the Department of Obstetrics and Gynecology at Saint Alexius Medical Center. Part of his responsibilities as Chairman required reviewing the work of other doctors and setting the quality of care for the hospital. In addition, Dr. Wener testified that he taught medical students at the University of California San Diego, and he was named "One of Chicago's Top Doctors" by his peers. This testimony demonstrates an understanding of the applicable standard of care by showing Dr. Wener is familiar with the medical community and more than just his own practice. When tailoring the reliability analysis to a medical standard-of-care expert, good grounds may come from the expert's own experience provided that experience has made him or her familiar with the type of medicine at issue. Dr. Wener shows that here, and therefore the circuit court did not err when it found his testimony reliable.

¶235 Further, the circuit court undertook a thoughtful analysis of the admissibility of Dr. Wener's testimony that shows it considered the reliability factors in order to determine good grounds for Dr. Wener's opinion. It noted that

Dr. Wener is not the kind of junk scientist Daubert sought to exclude and Dr. Wener's decision not to use medical literature was acceptable because the individualized nature of a determination made when caring for a particular patient is not something that can be published or peer reviewed. Also, the circuit court correctly found that Dr. Wener's method had an aspect of testability to it because the factors he relied on were, indeed, capable of being tested. Although it prudently and accurately observed that the nature of the case was "not in the nature of engineering or other more hard sciences," the circuit court properly admitted Dr. Wener's opinion based on Dr. Wener's experience.

¶236 Indeed, I emphasize that the circuit court does have and must have discretion to apply the Daubert analysis so as to fit the facts of each particular case, as the circuit court did here. See Kumho Tire, 526 U.S. at 150 ("Our emphasis on the word 'may' thus reflects Daubert's description of the Rule 702 inquiry as 'a flexible one.' Daubert makes clear that the factors it mentions do not constitute a 'definitive checklist or test.' And Daubert adds that the gatekeeping inquiry must be 'tied to the facts' of a particular 'case.'" (citations omitted) (quoting Daubert, 509 U.S. at 591, 593-94)). However, this discretion does not allow the circuit court to abdicate its role as gatekeeper in performing the reliability analysis. Id. at 158-59 (Scalia, J., concurring) ("[T]he discretion [the Court] endorses——trial-court discretion in choosing the manner of testing expert reliability——is not discretion to abandon the

23

gatekeeping function. . . . Rather, it is discretion to choose among reasonable means of excluding expertise that is fausse and science that is junky.").

¶237 As is evident by the circuit court's discussion of the Daubert factors, it did not abdicate its role as gatekeeper when admitting Dr. Wener's testimony; instead, the analysis indicates the circuit court thoughtfully and carefully considered the Daubert factors before turning to other considerations. The circuit court used its discretion to tailor its analysis to the type of expert we have here, namely a medical standard-of-care expert, and it looked to Dr. Wener's experience in order to determine reliability. In so doing, it noted that Dr. Wener used factors recognized by the medical community that he then "added up" based on his own experience with delivering babies, dealing with shoulder dystocia, and setting the quality of care at his hospital to reach a conclusion as to the standard of care required here. This, the circuit court said, made Dr. Wener's opinion reliable, and I see no error in this conclusion.

### 7. Dr. Balink's Arguments

¶238 Dr. Balink makes two main arguments as to the unreliability of Dr. Wener's opinion. First, she argues that Dr. Wener's testimony is based on nothing but his personal preferences, and second, she argues that Dr. Wener's failure to ground his testimony in any published medical literature makes his testimony unreliable. I address each argument in turn.

### i. Dr. Wener's Opinion Is More than Personal Preference

24

¶239 First, Dr. Balink argues Dr. Wener has nothing but his personal preferences to support his conclusion as to the standard of care and Dr. Balink's breach of that standard of care. Thus, his opinion is unreliable because it reflects only what Dr. Wener would do and not what the reasonable family practitioner practicing obstetrics in 2009 would do. While it may be true that Dr. Wener practices medicine in the manner he set forth as the applicable standard of care, that fact, standing alone, does not transform his opinion into a statement of personal preference. Dr. Wener assisted in setting the quality of care required at Saint Alexius Medical Center while he served there as Chairman of the Department of Obstetrics and Gynecology. Furthermore, Dr. Wener taught medical students and was named "One of Chicago's Top Doctors" by his peers. At least one other court has reached a similar conclusion when presented with the question of how to determine if a medical standard-of-care expert's testimony is reliable based on his experience. In Ellison v. United States, 753 F. Supp. 2d 468, 480-81 (E.D. Pa. 2010), the court dismissed the United States' argument that the standard-of-care expert based his opinion on his personal preferences because, "[t]aken as a whole, Dr. Super's testimony is that he has formulated an opinion as to the general—as opposed to simply his own, personal—standard of care and that, based on his experience, he had a reliable basis for doing so."

ii. There Is No Medical Literature Requirement

¶240 Second, Dr. Balink argues that Dr. Wener's failure to rely on published medical literature makes his opinion

25

unreliable. However, as the Third Circuit noted when it addressed medical literature in the context of differential diagnosis,

> [i]n the actual practice of medicine, physicians do not wait for conclusive, or even published and peer-reviewed, studies to make diagnoses to a reasonable degree of medical certainty. Such studies of course help them to make various diagnoses or to rule out prior diagnoses that the studies call into question. However, experience with hundreds of patients, discussions with peers, attendance at conferences and seminars, detailed review of a patient's family, personal, and medical histories, and thorough physical examinations are the tools of the trade, and should suffice for the making of a differential diagnosis even in those cases in which peer-reviewed studies do not exist to confirm the diagnosis of the physician.

Heller v. Shaw Indus., Inc., 167 F.3d 146, 155 (3d Cir. 1999); see also Dickenson, 388 F.3d at 980 (calling the district court's imposition of a medical literature requirement for a medical expert "an erroneous statement of the law"); Schneider, 320 F.3d at 406 ("Where there are other factors that demonstrate the reliability of the expert's methodology, an expert opinion should not be excluded simply because there is no literature on point."); Kudabeck v. Kroger Co., 338 F.3d 856, 862 (8th Cir. 2003) ("[P]ublication is not a prerequisite for admissibility."). The Court itself noted in Daubert that "[p]ublication . . . is not a sine qua non of admissibility." Daubert, 509 U.S. at 593. Thus, there simply is no medical literature requirement of the kind Dr. Balink suggests, and an expert's decision not to rely on literature does not render his opinion unreliable provided the expert has something else, like his experience, to make his opinion reliable. Thus, because

26

there is no requirement that an expert physician's testimony be based in whole or in part on medical literature and Dr. Wener showed how his experience makes his opinion reliable, the circuit court did not err when it admitted Dr. Wener's testimony.

¶241 It is true that Dr. Balink produced medical literature in this case that seemingly contradicted Dr. Wener's opinion, particularly regarding the threshold to use for the one-hour glucose tolerance test; however, Dr. Wener was able to meet that literature and provide an explanation for why, based on his experience, he did not agree with it. Thus, the presence of this literature does not render Dr. Wener's testimony unreliable as a matter of law, as Dr. Balink argues. Such a conflict of evidence boils down to an issue of credibility, requiring determination by the trier of fact. "Daubert makes the [circuit] court a gatekeeper, not a fact finder." United States v. Sandoval-Mendoza, 472 F.3d 645, 654 (9th Cir. 2006).

8. Determining the Reliable Application of Dr. Wener's
Principles and Methods

¶242 Last in the Daubert analysis, I determine that Dr. Wener reliably applied his comprehensive method to the facts of this case.

¶243 Under the Daubert analysis, we are to look for reliable principles and methods and a conclusion that logically follows from those reliable principles and methods. See Joiner, 522 U.S. at 144-46. If the expert's conclusion logically follows from reliable principles and methods, any

27

inconsistencies,[6] or flaws, go to the weight, or credibility, of the expert's testimony as opposed to its admissibility. See Lees, 714 F.3d at 525.

¶244 Such is the case here. As detailed above, Dr. Wener had a reliable method of determining the standard of care applicable to this case because of his experience. His conclusion that Dr. Balink breached that standard of care logically follows from that method. Thus, the inconsistencies Dr. Balink points to in her brief as examples of an unreliable application go to the weight to be given to Dr. Wener's testimony and not to the question of its admissibility. When assessing expert testimony, we are looking for good grounds, not flawless grounds. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Daubert, 509 U.S. at 596.

¶245 "[W]hen an expert purports to apply principles and methods in accordance with professional standards, and yet reaches a conclusion that other experts in the field would not reach, the [circuit] court may fairly suspect that the principles and methods have not been faithfully applied." Fed.

---

[6] Dr. Balink complains of inconsistencies in Dr. Wener's testimony. As one example, Dr. Balink points to Dr. Wener's testimony that he would not use a vacuum for a baby with an estimated fetal weight greater than 4,500 grams by ultrasound and that babies with an estimated fetal weight of greater than 4,500 grams are associated with an increased risk of shoulder dystocia. Dr. Balink argues that Dr. Wener's testimony is inconsistent for the facts of this case because Braylon's actual birth weight was only 4,370 grams.

R. Evid. 702 advisory committee notes (2000 amend.). This is not the case here, and Dr. Wener's testimony may not be excluded because, as the circuit court noted in the postverdict motion hearing, Dr. Balink's experts agreed with Dr. Wener in some respects. Thus, the circuit court did not have reason to exclude Dr. Wener's testimony because the record discloses no reason to suspect that Dr. Wener's application of his principles and methods to the facts of this case was unreliable.

¶246 In some cases the expert's conclusion bears on the reliability analysis because "conclusions and methodology are not entirely distinct from one another." Joiner, 522 U.S. at 146. For example, "[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." Id. However, provided the conclusions of the respective expert physicians logically follow from their methods and there is no analytical gap between the two, a court is not to choose between the differing conclusions of two experts; such a determination is left for the jury. See id. But this is not the case with Dr. Wener's testimony despite the fact that Dr. Balink presented contradictory medical literature and comes to a different conclusion. Thus, Dr. Wener's conclusion does not render his testimony inadmissible because it differs from Dr. Balink's conclusion.

¶247 In sum, I conclude that Dr. Wener's opinion is admissible. His comprehensive method is reliable and reliably applied. This is a result of his extensive experience that supports his opinion, and the circuit court did not err when it

29

found Dr. Wener's testimony admissible. Thus, Dr. Balink's request for a new trial based on the erroneous admission of Dr. Wener's testimony was properly denied.

### B. Counsel's Statements During Closing Arguments

¶248 Dr. Balink next argues that the circuit court erroneously denied her motion for a new trial because the effect of Atty. Levine's improper statements during closing arguments unfairly prejudiced the verdict.

¶249 Before addressing this argument, I first note that I conclude that Dr. Balink waived this argument by failing to move for a mistrial. See Wagner, 65 Wis. 2d at 249. However, like the court of appeals, I choose to address this argument under the court's discretionary jurisdiction.

¶250 A motion for a new trial based on unfairly prejudicial statements by counsel "is addressed to the discretion of the trial court." Id. at 249-50; see also Rodriguez v. Slattery, 54 Wis. 2d 165, 170-71, 194 N.W.2d 817 (1972) ("The trial court is in a particularly good 'on-the-spot' position to evaluate these factors."). Thus, we are bound to uphold the circuit court's decision unless the circuit court erroneously exercised its discretion. See Klein v. State Farm Mut. Auto. Ins., 19 Wis. 2d 507, 511, 120 N.W.2d 885 (1963).

¶251 Here, the circuit court gave an account of its reasoning. I see no reason to say the circuit court erroneously exercised its discretion by denying Dr. Balink's motion for a new trial.

### IV. CONCLUSION

30

¶252 In this instance, I conclude that experience is sufficient to satisfy Daubert's reliability requirement provided the expert shows how his experience makes his opinion reliable. No medical literature is required provided this is done. Thus, Dr. Wener's opinion is admissible in this case because he showed how his experience made his opinion reliable, and the circuit court did not err when it admitted his testimony at trial. Consequently, the circuit court did not err when it denied Dr. Balink's motion for a new trial based on her argument that the circuit court erroneously admitted Dr. Wener's testimony.

¶253 Further, I conclude the circuit court did not err when it denied Dr. Balink's request for a new trial based on the effect of counsel's statements during closing argument.

¶254 I do not reach Dr. Balink's request for a new trial in the interests of justice as Dr. Balink bases the request on the inadmissibility of Dr. Wener's testimony and the effect of counsel's statements during closing arguments. I consider it unnecessary to reach her request because I conclude that the circuit court properly admitted Dr. Wener's testimony and the verdict was not unfairly prejudiced by opposing counsel's statements.

¶255 Accordingly, I would affirm the decision of the court of appeals, and I concur in the court's judgment. I write separately, however, to express how I reach this result.

¶256 For the foregoing reasons I concur.

¶257 I am authorized to state that Chief Justice PATIENCE DRAKE ROGGENSACK joins this concurrence.

31

¶258 DANIEL KELLY, J. *(dissenting)*. I dissent, respectfully, because we missed an opportunity to clarify the standards for admission of expert testimony. This lack of clarity caused us to affirm the admission of testimony that does not satisfy the requirements of Wis. Stat. § 907.02 (2013-14).[1]

¶259 I agree with the lead opinion that an expert's personal experience can qualify him as an expert under Wis. Stat. § 907.02, making his testimony sufficiently "reliable" for admission to the jury. But that just begs the question: In light of that personal experience, to what is the admitted expert qualified to testify? Here, Dr. Wener's task was to identify and describe the standard of medical care against which to measure Dr. Balink's performance of her duties. His testimony failed to satisfy Wis. Stat. § 907.02 because there was no apparent match between this objective and his qualification as an undeniably accomplished obstetrician/gynecologist. As it turns out, we focused so narrowly on Dr. Wener's sterling professional credentials that we let him become the thing about which he was supposed to testify. That is, instead of determining whether Dr. Wener was qualified to discover and describe the proper standard of medical care, we found that he is the standard of medical care.

I

¶260 The primary question this case presents is whether the plaintiffs identified a proper standard of medical care against

---

[1] All subsequent references to the Wisconsin Statutes are to the 2013-14 version unless otherwise indicated.

which a jury could measure Dr. Balink's performance in the delivery of Braylon Seifert.[2] Even though this case progressed through a jury trial, an appeal, and review by this court, I find that I still do not know what that standard might be, or whether Dr. Wener was qualified to describe it.

¶261 Here is what we do know. We know young Seifert suffered a grievous injury at birth. We know the injury was caused by the manner in which he was delivered. We know he could have been delivered differently. We know that Dr. Wener says that if young Seifert had been delivered according to the practices and procedures he described, the injury very likely would not have occurred. And I believe he is right.

¶262 What I do not know is whether young Seifert's delivery was done negligently. The reason I do not know this is because no one described what care we should expect from the reasonably qualified family practitioner in the circumstances revealed by this case. That is, the jury never received a proper measuring stick against which to compare Dr. Balink's performance of her obligations.

---

[2] Dr. Balink phrased the issue as whether "an expert witness' qualifications and personal preferences [are] alone sufficient to meet Wis. Stat. § 907.02(1)'s new reliability standard?" Although this framing conflates the statute's subjective and objective criteria (as I discuss below), and so obscures the gravamen of her concern, there is no doubt her central complaint is that the plaintiffs' expert witness did not identify a proper standard of medical care.

¶263 As we sketch out the contours of Wis. Stat. § 907.02,[3] I think we should use a sharper pencil. As it is, we have not made the necessary distinction between the thing about which an expert is to testify, on the one hand, and on the other, the qualification to so testify. Because we did not make that distinction, it almost necessarily followed that our "qualification" inquiry focused on the wrong question.

¶264 The Seiferts tasked Dr. Wener with demonstrating that Dr. Balink delivered young Seifert negligently. That task comprises two separate responsibilities. First, Dr. Wener needed to identify the proper standard of medical care under the circumstances of this case. Francois v. Mokrohisky, 67 Wis. 2d 196, 200-01, 226 N.W.2d 470 (1975). And second, he had to opine on whether Dr. Balink's performance fell short of that standard. Christianson v. Downs, 90 Wis. 2d 332, 338, 279 N.W.2d 918 (1979) ("Unless the situation is one where the common knowledge of laymen affords a basis for finding negligence, expert medical testimony is required to establish the degree of care and skill required of a physician."). Competence in one of these subjects does not automatically conclude competence in the other. The proper standard of medical care and the failure to meet that standard are distinct subjects and should receive

_____

[3] The standard described in this statute was first enunciated in Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993), and later formalized as Federal Rule of Evidence 702 (as amended in 2000). Because § 907.02(1)'s wording mirrors that of the Federal Rule, and other states have followed suit, I will follow the lead opinion's example in consulting relevant cases from other jurisdictions.

distinct treatment. This means the proffered expert must satisfy the court he has the necessary qualifications to speak on each one.

¶265 We did not, however, require this of Dr. Wener. That is, we allowed the Seiferts to graft Dr. Wener's competence to testify with respect to the second inquiry (performance in relation to the standard) onto the first (identification of the standard). Perhaps he can authoritatively speak on both subjects, but we do not know because no one asked. And he was not asked because there was insufficient appreciation of the need to conceptually separate the two inquiries. Here is what I mean.

A

¶266 I assume Dr. Wener is a very talented obstetrician. Indeed, for the sake of illustration, I will assume he is the gold standard when it comes to delivering babies under the circumstances this case presents. To what, then, shall we have him testify? Shall we learn from him the optimal means of delivering babies in those circumstances? Or should he teach us how the reasonably qualified family practitioner delivers babies in such circumstances? There are potentially leagues of difference between the answers to these questions. If we select the first, we will hear about the best possible practices that could have been followed in young Seifert's delivery. If we select the second, however, we will hear what we may legitimately expect from any given family practitioner. Put another way, the first option informs us of the care we all

4

want, while the second describes the standard of medical care to which we may hold all family practitioners accountable.

¶267 Qualifying under the first option is pretty straightforward. Having established himself as the gold standard, it necessarily follows that Dr. Wener may authoritatively opine on how he would deliver a baby when confronted with patients like the Seiferts. Thus would he establish the standard of medical care for the case, a reference point we might usefully call the "What Would Wener Do" standard ("WWWD"). This is a narrowly vertical inquiry——we explore the depth, and precision, of his knowledge, experience, and practice in relation to the circumstances at hand.

¶268 As I will explain at greater length below, qualifying under the second option calls for something different. It is a broadly horizontal inquiry. It requires that the testifying doctor have more than just knowledge of the best method of delivering a baby in such circumstances. In light of the natural variability inherent in the practice of medicine, it requires that he be familiar with what is <u>generally</u> expected of reasonably qualified practitioners under similar circumstances.[4] He must have a source of knowledge that informs him of what other doctors do under similar circumstances, or describes what

---

[4] <u>Francois v. Mokrohisky</u>, 67 Wis. 2d 196, 201-02, 226 N.W.2d 470 (1975) ("The standard to which [physicians] must conform . . . is determined by the practices of neither the very best nor the worst of the class. Like automobile drivers, engineers, common laborers, and lawyers, they are obliged to conform to reasonable care in the circumstances.").

5

they ought to do, or what they must do. His knowledge of such things must be extensive enough that he can distill from it certain practices and procedures of sufficiently widespread implementation that one may conclude that they represent a standard known to reasonably qualified doctors in the relevant field of practice.

¶269 If he cannot do this, and yet he testifies, then we allow him to collapse the medical field into himself, and we appoint him the reference point against which we measure all doctors who deliver babies. For the following reasons, I believe this is untenable, and it is not what Wis. Stat. § 907.02 either requires or authorizes.

1

¶270 I will begin by describing the nature of the standard applicable to this case. That is, I will explain why I believe it is essential that the standard be external to the testifying expert. Afterwards, I will address Dr. Wener's qualification to testify regarding that standard.

¶271 The Seiferts bore the burden of establishing the standard of medical care to which they wished to hold Dr. Balink accountable. Carney-Hayes v. Nw. Wis. Home Care, Inc., 2005 WI 118, ¶37, 284 Wis. 2d 56, 699 N.W.2d 524. Generally speaking, expert testimony is necessary to meet that burden: "Unless the situation is one where the common knowledge of laymen affords a basis for finding negligence, expert medical testimony is required to establish the degree of care and skill required of a physician." Christianson, 90 Wis. 2d at 338. Negligence, in

this case, turns (at least in part) on recognizing circumstances that call for a three-hour glucose diagnostic test (rather than a one-hour screening test), when it is necessary to perform an ultrasound examination of the baby immediately before delivery, and when a vacuum assistance device may or may not be used to assist the baby in making his exit from the birth canal. These are not subjects on which laypeople would commonly find themselves knowledgeable.

¶272 The expert's first task, therefore, is to identify the relevant standard of medical care, which must "be established by a determination of what it is reasonable to expect of a professional given the state of medical knowledge at the time of the treatment in issue." Nowatske v. Osterloh, 198 Wis. 2d 419, 438-39, 543 N.W.2d 265 (1996), abrogated on other grounds by Nommensen v. Am. Cont. Ins. Co., 2001 WI 112, 246 Wis. 2d 132, 629 N.W.2d 301. This means one may not establish a standard with reference to what one doctor, or a non-representative sampling of doctors, would do under the circumstances. A "standard" is not the same thing as the existence of alternative procedures or more accomplished practitioners.

¶273 A standard is, instead, normative. It is a reference point external to the testifying doctor, something commonly accessible by those practicing in the relevant field:

> True, there was evidence that other physicians might have acted differently and that there were alternate procedures available, but no physician testified that what was done did not comport with approved medical practice under the circumstances. As we said in Trogun v. Fruchtman, 58 Wis. 2d 569, 584, 207 N.W.2d 297 (1973):

7

> '(A) plaintiff must prove the defendant failed to give him, not the highest degree of care, but merely the reasonable care and skill <u>usually possessed</u> by physicians of the same school . . . .'

<u>Francois</u>, 67 Wis. 2d at 201 (emphasis added). A physician answers to this normalized reference point, not to the WWWD standard of medical care: "He is obliged to conform to the <u>accepted</u> standard of reasonable care, but he is not liable for failing to exercise an extraordinary degree of care." <u>Id.</u> (emphasis added).

¶274 Other courts reject self-referential standards of medical care, too. Massachusetts says that "[b]ecause the standard of care is based on the care that the average qualified physician would provide in similar circumstances, the actions that a particular physician, no matter how skilled, would have taken are not determinative." <u>Palandjian v. Foster</u>, 842 N.E.2d 916, 920-21 (Mass. 2006). The Michigan Supreme Court recently addressed this issue in <u>Elher v. Misra</u>, 878 N.W.2d 790 (Mich. 2016) (per curiam). It rejected the proffered expert's testimony because "his opinion was based on his own beliefs, there was no evidence that his opinion was <u>generally accepted</u> within the relevant expert community, there was no peer-reviewed medical literature supporting his opinion, plaintiff failed to provide any other support for [the expert's] opinion, and defendants submitted contradictory peer-reviewed literature." <u>Id.</u> at 798 (emphasis added). California has long recognized that "the fact that another physician or surgeon might have elected to treat the case differently or use methods other than

8

those employed by defendant does not of itself establish negligence." Lawless v. Calaway, 147 P.2d 604, 607 (Cal. 1944). The District of Columbia says that "[t]he personal opinion of the testifying expert as to what he or she would do in a particular case, without reference to a standard of care, is insufficient to prove the applicable standard of care." Travers v. District of Columbia, 672 A.2d 566, 568 (D.C. 1996). South Carolina's court of appeals has similarly stated that if an expert "merely testifies as to his own personal standard of care, rather than the generally recognized and accepted standard of care, such testimony is insufficient to survive summary judgment." Melton v. Medtronic, Inc., 698 S.E.2d 886, 893 (S.C. Ct. App. 2010). In Wallbank v. Rothenberg, 74 P.3d 413, 416 (Colo. Ct. App. 2003), the Colorado Court of Appeals said that "a standard of care may not be established by the testimony of the personal practices of expert witnesses." Georgia also follows this rule: A party "may not establish the applicable standard of care with evidence of an expert witness's personal practices, or evidence about the course of conduct the expert would have followed under similar circumstances." Dendy v. Wells, 718 S.E.2d 140, 144 (Ga. Ct. App. 2011). Arizona's court of appeals recognizes that testimony regarding a physician's personal practices can be useful to the jury, but only after the standard of care is established. See Smethers v. Campion, 108 P.3d 946 (Ariz. Ct. App. 2005).[5]

---

[5] Treatises reflect the same principles. See, e.g., 29 Charles Alan Wright & Victor Gold, Federal Practice & Procedure:

(continued)

9

¶275 Nor may physicians smuggle their own practices or preferences past the Daubert gatekeeper by box-checking expected phrases. Missouri's court of appeals provided the only logical response to such an effort. It reasoned that "[i]n articulating the appropriate legal standard of care, it is insufficient for an expert merely to use the terms 'accepted medical standards' or 'standards of care.'" Sheffler v. Arana, 950 S.W.2d 259, 267 (Mo. Ct. App. 1997). Instead, the court said "an expert should be properly oriented with the meaning of negligence in a health care provider context and, in fact, employ the legal standards in offering his opinion." Id. The court recognized that "[t]he purpose of these requirements is to prevent experts from relying upon their own views of acceptable practice rather than applying the objective legal standards." Id.

¶276 Our cases, and those across the country, teach us that a proper standard of medical care is one that is "approved," "generally recognized," "customary," "generally accepted," or "objective," and that describes skills "usually possessed" by a physician in the relevant field of practice. However one chooses to synthesize this into a single descriptor, the manifest import is that a standard of medical care exists

---

Evidence § 6268.1 (2d ed. 2016) ("In a non-scientific context, the reliability of an expert's methodology often will be a function of accepted practice in the area of expertise in question."); 5 D.W. Louisell & H. Williams, Medical Malpractice § 29.01, at 29-7 (2005) ("The standard is measured against what a reasonably prudent practitioner in the defendant's position would do, not what any individual physician or physicians might do.").

separately and apart from the testifying expert, it is widespread within the relevant medical community, it has gained at least some acceptance, and it is legitimate to charge a reasonably qualified physician with its knowledge.

2

¶277 Doctor Wener did not identify such a standard. One of the consequences of not requiring the expert to focus on an external, generally-known standard is that the resulting testimony resolves into a self-portrait. As the circuit court and the lead opinion's characterization of his testimony demonstrate, that is largely what happened here:

- "Dr. Wener formulated an opinion about the standard of reasonable care of family practice doctors practicing obstetrics on the basis of his experiences. . . ." Lead op., at ¶103.

- Dr. Wener's methodology consisted of the "conscientious use of the thousands of instances in which he had delivered babies and made decisions about the care of individual patients and his teaching and hospital experiences relating to obstetrics." Lead op., at ¶105.

- "[E]ssentially a comparison of the instant case to other deliveries . . . ." Lead op., at ¶106.

- "He used his many experiences to arrive at an opinion in the instant case that is sufficiently similar to his vast array of clinical experiences over decades of practice." Lead op., at ¶107.

- "The circuit court ruled that Dr. Wener's methodology was reliable based on Dr. Wener's extensive personal experiences." Lead op., at ¶109.

¶278 A review of the transcript confirms the accuracy of these characterizations. Here, for example, is the closest Dr. Wener came to establishing any standard of medical care with

11

respect to use of a vacuum to assist in the delivery of young Seifert:

> My opinion is that the standard of care required that a vacuum not be applied on this child at all. Because of the risk factors already established for shoulder dystocia, and knowing that the vacuum is the largest of the risk factors, you're adding a major risk factor on top of that. And in my opinion that's why the baby had a severe brachial plexus injury.

That may or may not be a proper standard of medical care, but because he never described how he goes about discovering such standards, this ends up as the type of ipse dixit that Sheffler properly rejected.

¶279 With respect to whether Dr. Balink should have performed an ultrasound immediately before young Seifert's birth, Dr. Wener said: "I would have known that an ultrasound——assuming it's done within the standard of care——would have been within 10 to 15 percent off. And [with] a baby that's 9 pounds 12 ounces, [an] ultrasound would have shown a macrosomic infant." This is two steps removed from establishing a standard of medical care. First, he is simply describing what he knows. And second, he says nothing about whether this knowledge necessarily means an ultrasound should have been done immediately before birth to meet the applicable standard of medical care. And if he believes this is what is required to meet the standard, he has offered nothing to establish how he knows this is, in fact, the standard.

¶280 Dr. Wener's testimony reveals he is impressively qualified along the vertical axis; his experience and knowledge are deep, deep. Surely this is the physician one would want in

12

attendance when faced with the Seiferts' situation. But his testimony along the horizontal axis was almost non-existent. What he described was what he would have done had he been the attending physician. That is, he testified that the relevant standard of medical care was WWWD; he told us little about what a reasonably qualified family practitioner ought to have done for the Seiferts. Consequently, the jury received the case without knowing the proper standard against which to compare Dr. Balink's performance. And that is why we still do not know whether Dr. Balink negligently delivered young Seifert.

B

¶281 So now I arrive at the subject that gave rise to our consideration of this case: Dr. Wener's qualification under Wis. Stat. § 907.02 to testify about his opinions. This statute contains both subjective and objective criteria, both of which he must satisfy before giving his thoughts to the jury:[6]

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if the testimony is based upon sufficient facts or data, the testimony is the product of reliable principles and methods, and the witness has applied the principles and methods reliably to the facts of the case.

---

[6] I use the terms "subjective" and "objective" in their grammatical sense. These terms separate the one testifying (the subject) from the thing about which the subject is testifying (the object). So the subjective element of Wis. Stat. § 907.02 inquires into Dr. Wener's qualifications, while the objective element concentrates on the thing about which he testifies (the standard of medical care).

Wis. Stat. § 907.02(1).

¶282 On the objective criterion, Dr. Wener may testify if his opinions are "based upon sufficient facts or data, the testimony is the product of reliable principles and methods, and the witness has applied the principles and methods reliably to the facts of the case." Id. With respect to the subjective criterion, he must be "qualified as an expert by knowledge, skill, experience, training, or education." Id.

1

¶283 I have already addressed the objective criterion——it is the standard of medical care. In the context of this case, "facts or data" are situations like the Seiferts' and how reasonably qualified family practitioners respond to them. The "reliable principles and methods" are the means by which a qualified expert informs himself of those facts and data. As described above, Dr. Wener offered no such testimony. He did not offer testimony about the skills usually possessed by family practitioners who deliver babies. He did not tell us what the "generally accepted" practices might be, what is "approved," or "generally recognized," or "customary." Nor did he say anything about the "principles and methods" he used to discover that information. Instead, he offered himself——a supremely qualified obstetrician——as the standard of medical care. The result was a conflation of the objective and subjective criteria.

¶284 This was a mistake for two reasons. First, by allowing Dr. Wener to become the standard against which to measure Dr. Balink's performance, we eliminate the concept of a

14

consistent and knowable standard against which to measure a physician's performance. It's WWWD this time. But the plaintiffs in the next malpractice case might employ a different expert witness, thereby establishing a new standard. So as a practical matter, no one will know the "standard" of medical care until the plaintiffs reveal their expert witness.

¶285 Second, even if it is appropriate to pick a specific doctor and make his practices the touchstone, as opposed to an objectively-verifiable standard external to the expert, we allowed the plaintiffs in this case to pick the wrong doctor. Dr. Wener is an obstetrician. Dr. Balink is a family practitioner. The standard of medical care expected of each are not the same. We must assess a physician's conduct in the context of the field in which she practices. <u>Phelps v. Physicians Ins. Co. of Wis., Inc.</u>, 2005 WI 85, ¶40, 282 Wis. 2d 69, 698 N.W.2d 643. This is such an embedded principle in our law that it even appears in our pattern jury instructions:

> In (treating) (diagnosing) (*plaintiff*)'s (injuries) (condition), (*doctor*) was required to use the degree of care, skill, and judgment <u>which reasonable (doctors who are in the general practice) [or] (specialists who practice the specialty which (*doctor*) practices) would exercise in the same or similar circumstances</u>, having due regard for the state of medical science at the time (*plaintiff*) was (treated) (diagnosed). A doctor who fails to conform to this standard is negligent. The burden is on (*plaintiff*) to prove that (*doctor*) was negligent.

15

Wis. JI——Civil 1023 (emphasis added). So if the expert himself is to be the standard, we should at least require that he is from the same field of practice.[7]

¶286 Dr. Wener's testimony neither identified a standard external to himself, nor did it describe what we should expect of a family practitioner, as opposed to an obstetrician. His testimony should have been excluded because it did not satisfy the objective criterion of Wis. Stat. § 907.02. Not because he was unqualified to testify about what he would have done had he been the attending physician (no one is better qualified to offer that testimony), but because in the main he did not describe what we may expect of reasonably qualified family practitioners, and so failed to satisfy the objective criterion.

2

¶287 I say Dr. Wener did not describe the required standard "in the main" because there were a few pieces of testimony that contained the seed of such a standard. For example, with respect to when a three-hour glucose test should be conducted based on the results of the one-hour glucose screening, Dr. Wener said the following:

> Q: You're also aware that some, as you mentioned some people use a 140?

---

[7] If the expert offers proper testimony——that is, a standard of medical care external to himself——then it is not necessary that he come from the same field of medical practice as the physician in question. Thus, if Dr. Wener can demonstrate he has the requisite knowledge to identify and describe the standard of medical care applicable to family physicians in these circumstances, there is no reason he could not qualify as an expert.

16

A: Yes.

Q: [O]f what significance was it that the glucose tolerance one hour testing revealed to be 131?

A: Well 131 is abnormal. By 2009, those providing obstetrical care were using 130. For many, many years prior to that it had been 140. And then probably around the turn of the century . . . changed to 130. And by 2009 most everyone was using 130. . . . And to use 140 as a cut off is not the right number.

This, of course, is just one piece of information that goes into describing what a reasonably qualified doctor would do for the Seiferts (although whether it describes the "cut-off" family practitioners, as opposed to obstetricians, were using as of 2009 cannot be determined from the testimony).

¶288 If this seed had matured into a fully-formed objective standard applicable to family practitioners, we would ask whether Dr. Wener satisfied the subjective criterion of Wis. Stat. § 907.02. We do so by looking to his "knowledge, skill, experience, training, or education." Id.

¶289 But we would not look at those qualities in a vacuum——we would be interested in them insofar as they bear on the objective criterion (the standard of medical care). That is, we must allow the standard of medical care to focus our attention on the type of background we should require of the proffered expert witness. In this case, we would ask not whether Dr. Wener is a well-qualified obstetrician (he is). We would instead ask whether he has the knowledge, experience, training, or education necessary to search out and describe the standard of medical care we may reasonably expect a family practitioner to meet.

17

¶290 The background required by the subjective criterion may not be as obvious as it might appear. As much as we wish the practice of medicine to be a scientific endeavor, it inescapably encompasses a substantial amount of art. And to the extent it is a science, it is nonetheless constantly developing and evolving. All physicians learn the practice of medicine in (presumably) the same general sense——they attend medical school. But the United States has 147 medical schools,[8] and it is reasonable to expect that each will offer instruction that varies in technique, emphasis, expertise, and extent. The current result of those natural variations is over 900,000 practicing physicians[9] spread amongst 5,600 hospitals[10] and many additional smaller clinics and offices.

¶291 Theoretically, those initial variations could amplify once the physician begins his practice and encounters new methods, analyses, equipment, or experiences. Or, conversely, they could dampen as the hospitals and other centers of practice

---

[8] About the AAMC, Assoc. of Am. Med. Colleges (last visited Jan. 3, 2017), https://www.aamc.org/about.

[9] Total Professionally Active Physicians, The Henry J. Kaiser Family Found. (last accessed Jan. 3, 2017), http://kff.org/other/state-indicator/total-active-physicians/?currentTimeframe=0&selectedRows=%7B%22nested%22:%7B%22all%22:%7B%7D%7D,%22wrapups%22:%7B%22united-states%22:%7B%7D%7D%7D&sortModel=%7B%22colId%22:%22Location%22,%22sort%22:%22asc%22%7D (stating that in September 2016 there were 926,119 practicing physicians in the United States).

[10] Fast Facts on US Hospitals, Am. Hosp. Ass'n (Jan. 2016), http://www.aha.org/research/rc/stat-studies/fast-facts.shtml (stating that in January 2016 there were 5,627 U.S. hospitals registered with the American Hospital Association).

18

impose some measure of uniformity on practitioners. Whichever it is, the result is the same——there is no obvious playbook to which we, or a practitioner, may readily resort to determine what "ought" to be done in every given circumstance. The "ought" is out there, but courts and juries are not equipped to identify it on their own. That is why we need experts to sift through all the different ways in which physicians treat their patients, the extant literature on the subject at hand (if any), and information from any other potentially instructive source, to identify the common threads with which to stitch together a standard of medical care.

¶292 The background required to do a competent job of such sifting and identifying is not necessarily the same as the background that leads to successful, injury-free deliveries of babies like young Seifert. This case calls for an expert who is familiar with the type of training and experience typical of family practitioners (not obstetricians), the type of equipment available to them, the tests and diagnostic procedures they commonly employ, and their practical responses to situations like that of the Seiferts. This is a background that reflects a broadly horizontal outward focus——what do others know, and experience, and do? It may be that Dr. Wener has that kind of background and knowledge, but he did not speak of it in this case.

¶293 This division between subjective and objective criteria is essential to the rule of law as it relates to negligence, especially in the context of medical malpractice.

19

When the Seiferts asserted their cause of action against Dr. Balink, the import of their claim was that there existed a knowable standard of medical care and that she failed to conform to that standard when she delivered young Seifert. Dr. Balink did not know that a court, sometime in the future, would decide that the standard governing her conduct would be WWWD. And there is no apparent reason why she should have known that.

¶294 To the extent the lead opinion concludes that a person's personal experience can qualify him as an expert witness for the purpose of testifying about a standard of medical care, I have no dispute. But because our pencil was not sharp enough in answering that question, the holding we announce today is that an individual doctor's personal experience can be the standard of medical care.

¶295 And for that reason, I respectfully dissent.

¶296 I am authorized to state that Justice REBECCA GRASSL BRADLEY joins this dissent.